Alan D. GORDON, M.D., Appellant,

v.

LEWISTOWN HOSPITAL, a
non-profit corporation.

Commonwealth Court of Pennsylvania.

Argued April 16, 1998.
Decided July 24, 1998.

Orris C. Knepp, III, Lewistown, for appellant.

Mark L. Mattioli, Philadelphia, for appellee.

Before COLINS, President Judge, and LEADBETTER, J., and LORD, Senior Judge.

LORD, Senior Judge.

Alan D. Gordon, M.D. appeals an order of the Court of Common Pleas of Mifflin County, which granted defendant Lewistown Hospital's motion for summary judgment.

On July 14, 1992, Dr. Gordon had a verbal altercation with an emergency room nurse whom he believed had not acted in the best interests of his patient and who had not

taken a triage report on the patient despite adequate time to do so. Dr. Gordon admits that he told the nurse that "she should get off her ass and that she was a wrench in the works, she was obstructing patient care."[1] Prior to this incident, on February 13, 1992, the Chairman of the hospital's Credentials Committee had warned Dr. Gordon by letter that his next episode of disruptive behavior would result in the committee's recommendation to the Board of Trustees that he be suspended.[2] After investigating the July 14, 1992 incident, the Credentials Committee informed Dr. Gordon on August 3, 1992 that it was recommending that he be suspended for 28 days. Dr. Gordon maintains that he asked for a timely hearing, and that he was eventually informed that he could not contact certain witnesses on the Credentials Committee's witness list without prior notice to and approval from the hospital's president. On February 16 and April 5, 1993, the hospital held hearings on Dr. Gordon's alleged disruptive behavior of July 14, 1992.

At the first hearing, Dr. Michael Fishter testified on behalf of the Credentials Committee. Dr. Fishter's testimony and report relied on 144 documents (not introduced into evidence) recounting instances of Dr. Gordon's purportedly disruptive behavior. Dr. Gordon complained because he was not given access to these documents. The Hearing Officer allowed into evidence Dr. Fishter's testimony and report, but acknowledged that, with regard to these 144 documents, Dr. Fishter was relying on hearsay, and the Hearing Officer explained that the amount of weight to be accorded this evidence could be determined later. On June 30, 1993, the Hearing Officer found that a 28-day suspension was unreasonable and not supported by the evidence. He stated "Taking into consideration the long history of difficulties with Dr. Gordon, and the pattern of disruption noted by Dr. Fishter, it is recommended that a fourteen calendar day suspension (rather than the usual seven calendar day suspen-

sion) is warranted by all of the testimony and evidence received." (Hearing Officer's Recommendation and Report, dated June 30, 1993, p. 8).

Dr. Gordon appealed this decision to the Appellate Review Panel, contending that certain physicians on the Credentials Committee were predisposed against him, and that the Hearing Officer's improper consideration of Dr. Fishter's report resulted in a 2-week rather than 1-week suspension and the denial of a fair hearing. After review, the Appellate Review Panel adopted the Credentials Committee's initial recommendation that Dr. Gordon be suspended for 28 days, and the Board of Trustees unanimously adopted the Appellate Review Panel's recommendation on August 30, 1993. By letter dated August 31, 1993, Dr. Gordon was informed that his suspension would begin on September 20, 1993 and continue through October 17, 1993. Prior to the suspension, Dr. Gordon had filed a preliminary injunction with the common pleas court to stop it, but that preliminary injunction was denied. Dr. Gordon had also filed a complaint with the common pleas court on September 17, 1993, and, while Dr. Gordon was serving his suspension, the hospital issued a press release in response to this complaint.

On November 8, 1993, Dr. Gordon filed a petition for leave to amend his complaint, which petition the hospital opposed. The common pleas court thereafter allowed the amendment. The hospital had opposed the amendment on the grounds that the Health Care Quality Improvement Act of 1986 (Federal Act), 42 U.S.C. §§ 11101–11152 renders it immune from any such suit. The hospital filed preliminary objections to the complaint, some of which the common pleas court granted, and Dr. Gordon then filed an Amended Count VI to his Amended Complaint. Afterwards, the hospital filed a motion for summary judgment on the four remaining counts:

1. The emergency room nurse contended that Dr. Gordon used even more profane language, but the common pleas court accepted as true Dr. Gordon's version of what happened.

2. This letter from Daniel Creighton, M.D., Credentials Committee Chairman, stated at the last:

> Be advised that the next episode of disruptive behavior on your part brought before this Committee and found to be substantiated will result in the recommendation to the Board of Trustees of Lewistown Hospital that you be suspended from the medical staff.

(1) violation of Dr. Gordon's due process and equal protection rights under the 14th Amendment of the U.S. Constitution (Count II); (2) tortious interference with business relations (Count III); (3) defamation (Count V); and (4) breach of contract (Amended Count VI of the Amended Complaint). As the common pleas court noted, this last claim is the only state law claim that specifically requests a non-monetary as well as a monetary remedy.

After filing a notice of appeal with this Court, Dr. Gordon now raises the following questions. 1) Whether the hospital is entitled to immunity under the Federal Act from claims for monetary damages; 2) whether the hospital is entitled to summary judgment on the fourteenth amendment due process and equal protection claims; 3) whether the hospital is entitled to summary judgment on the tortious interference with business relations claim; 4) whether the hospital is entitled to summary judgment on the defamation claim; and 5) whether the hospital is entitled to summary judgment on the breach of contract claim.[3]

At the outset, we make it clear that this is not a case where we are called upon to review by way of an appeal the propriety of Dr. Gordon's suspension. That question has now been decided and the case is concluded. We are here reviewing the summary judgment granted by the common pleas court on

the doctor's lawsuit brought against the hospital for what he claims are basic, and in some instances, constitutional violations of his rights.

First, we consider the question of whether the hospital is entitled to immunity under the Federal Act from claims for monetary damages arising out of a professional review action. Of course, Dr. Gordon asserts that the hospital has no such entitlement. It appears that this issue is one of first impression for our state appellate courts.

Section 11111(a)(1) of the Federal Act generally provides that a professional review action of a professional review body that meets the standards set forth in section 11112(a) "shall not be liable in damages under any law of the United States or of any *State* (or political subdivision thereof) with respect to the action." (Emphasis added).[4] As the hospital notes, this pronouncement makes clear that the contemplated immunity applies to state as well as federal claims. Further, in *Allison v. Centre Community Hospital*, 145 Pa.Cmwlth. 495, 604 A.2d 294 (1992), we discussed the relevance of the Federal Act although we did not actually apply it.[5]

There, we explained:

> The Federal Act limits damages recoverable in lawsuits against the persons and

---

**3.** Our scope of review over a trial court's grant of summary judgment is limited to determining whether the trial court made an error of law or abused its discretion. *Salerno v. LaBarr*, 159 Pa.Cmwlth. 99, 632 A.2d 1002 (1993), *appeal denied*, 537 Pa. 655, 644 A.2d 740 (1994).

**4.** Section 11151(9) of the Federal Act defines a "professional review action" as

an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients) and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician. Such term includes a formal decision of a professional review body not to take an action or to make a recommendation described in the previous sentence and also includes professional review activities relating to a professional review action.

Section 11151(9) then proceeds to list actions "not considered to be based on the competence or professional conduct of a physician[,]" which actions are not relevant here.

Section 11151(11) of the Federal Act defines a "professional review body" as "a health care entity and the governing body or any committee of a health care entity which conducts professional review activity, and includes any committee of the medical staff of such an entity when assisting the governing body in a professional review activity."

**5.** In *Allison*, we held that, for purposes of review of a hospital's determinations with respect to staff privileges, the public/private institution dichotomy is not necessary, and the trial court is limited to deciding whether the hospital complied with federal and state procedural safeguards in revoking a physician's staff privileges. *See also Saad v. Sacred Heart Hospital*, 700 A.2d 604, 606, n. 5 (Pa.Cmwlth.1997).

entities which conduct professional review activities. In exchange for this benefit, the hospital (or other health care facility) must provide fair investigation and hearing procedures. 42 U.S.C.A. § 11112(a) sets forth that a professional review action must be taken (1) in the reasonable belief that such action is in the furtherance of quality health care, (2) after a reasonable effort to obtain the facts, (3) after adequate notice and hearing procedures are afforded to the physician, and (4) in the reasonable belief that the action was warranted by the facts known after a reasonable effort to obtain the facts *and* after meeting the requirement of paragraph (3). Section 11112(a) further states that a professional review action shall be presumed to have met the standards necessary for the Federal Act's protection unless the presumption is rebutted by a preponderance of the evidence. Section 11112 goes on to provide the required elements of adequate notice and hearing procedures.

In Pennsylvania, the requirement for the content of medical staff bylaws, rules and regulations is set forth in 28 Pa.Code § 107.12. That section requires that fair hearing and appellate review mechanisms be provided. This requirement comports with the Federal Act.

*Id.*, 604 A.2d at 297 (emphasis in original) (footnote omitted). Although it was not necessary to a determination to apply the immunity provisions of the Federal Act in *Allison,* we clearly recognized its applicability in this Commonwealth.

This is true although Dr. Gordon cites *Cooper v. Delaware Valley Medical Center,* 539 Pa. 620, 654 A.2d 547 (1995) for the proposition that there is no presumption of immunity for suits against a hospital arising out of a peer review setting. We have thoroughly reviewed *Cooper* and agree that it holds that hospitals are not immune from suit for peer review *pursuant to Section 3(b) of the Commonwealth's Peer Review Protection Act,* Act of July 20, 1974, P.L. 564, *as amended,* 63 P.S. § 425.3(b).[6] That is not to say, however, that no immunity provisions exist at all. Although the Pennsylvania Supreme Court referred to the Federal Act in *Cooper,* the Court did not apply it in that case, where, as the hospital notes in its brief, the relevant events in *Cooper* took place before October 14, 1989, the date that the Federal Act was made effective to bar monetary damages in federal and state law claims.[7] Therefore, the mere fact that the Supreme Court did not apply the Federal Act in *Cooper* does not support Dr. Gordon's assertion that the hospital in this case is not entitled to immunity under that act after the effective date of its immunity provisions.

Moreover, in *Mathews v. Lancaster General Hospital et al.,* 87 F.3d 624 (3d Cir.1996), Dr. Robert S. Mathews sued Lancaster General Hospital, Columbia Hospital, and various doctors, claiming that they conspired to restrict his physician's privileges in violation of the federal anti-trust laws and state law. The United States Court of Appeals for the Third Circuit affirmed the decision of the United States District Court for the Eastern District of Pennsylvania that all defendants, except Columbia Hospital, were immune from suit for monetary damages under the Federal Act. (It was determined that Columbia Hospital did not hold a professional review action with regard to Dr. Mathews). The federal appeals court also affirmed the district court's decision inasmuch as the district court had entered summary judgment

---

**6.** This is obviously why the Peer Review Protection Act did not form a basis for the hospital's summary judgment motion.

**7.** Section 11111(c) ["Treatment under State laws"] provides:
**(1) Professional review actions taken or on after October 14, 1989**
Except as provided in paragraph (2), subsection (a) of this section shall apply to State laws in a State only for professional review actions commenced on or after October 14, 1989.
**(2) Exceptions**

**(A) State early opt-in**
Subsection (a) of this section shall apply to State laws in a State for actions commenced before October 14, 1989, if the State by legislation elects such treatment.
**(B) Effective date of election**
An election under State law is not effective, for purposes of [sic], for actions commenced before the effective date of the State law, which may not be earlier than the date of the enactment of that law.
(Footnote omitted).

against Dr. Mathews on his anti-trust claims, including those claims requesting injunctive relief, and dismissed his pendent state law claims without prejudice. On the immunity question, the appeals court held that Section 11112(a) of the Federal Act, with its requirements of reasonableness and adequate notice and hearing procedures, creates an objective standard, such that a defendant's bad faith is not material, so long as the four-prong test of section 11112(a), to determine if a fair hearing and investigation occurred, is met.

Guided in particular by the language of the Federal Act, making its immunity provisions applicable to states, as well as by *Allison* and *Mathews*, we hold that the Federal Act entitles the hospital herein to immunity from Dr. Gordon's suit seeking monetary damages for its professional review action if, once again, that action was taken:

(1) in the reasonable belief that the action was in the furtherance of quality health care,

(2) after a reasonable effort to obtain the facts of the matter,

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

Section 11112(a)(1)–(4).

As well, the United States Court of Appeals stated in *Mathews*, 87 F.3d at 633:

The Act includes a presumption that a professional review activity meets the standards for immunity, "unless the presumption is rebutted by a preponderance of the evidence." 42 U.S.C. § 11112(a). This presumption results in an "unusual standard" for reviewing summary judgment orders under the Act. "In a sense, the presumption language in [the Health Care Quality Improvement Act] means that the plaintiff bears the burden of proving that the peer review process was not reasonable." *Bryan v. James E. Holmes Region-*

*al Medical Ctr.*, 33 F.3d 1318, 1333 (11th Cir.1994) (emphasis in original), cert. denied, 514 U.S. 1019, 115 S.Ct. 1363, 131 L.Ed.2d 220 (1995).

■ Thus, we are faced with the following case and statute-supported methods for review. In an instance like this one, there is, first, on behalf of the hospital, a presumption of the validity of its disciplinary procedures. That presumption can only disappear if the doctor produces sufficient, credible evidence to prove that any of the four above-mentioned elements were not met. We examine the evidence with this construct in mind.

Dr. Gordon first contends that the Board of Trustees did not take its professional review action in the reasonable belief that the action furthered quality health care. In our estimation, Dr. Gordon does not offer any compelling arguments in this regard, but instead maintains that he was improperly suspended for being a "disruptive" physician rather than a doctor who provides substandard care; that he testified that his suspension was not undertaken in the reasonable belief that it furthered quality health care and that his suspension meant certain ophthalmologic services were unavailable to the community for four weeks; and that the hearing officer, the one truly disinterested person who reviewed his case, decided that a 28–day suspension was "unreasonable, not sustained by the evidence and unfounded." (Hearing Officer's Recommendation and Report, dated 6/30/93, p. 8).

Of course, none of these assertions tend to show that the Board's decision to suspend Dr. Gordon was not made in the reasonable belief that his suspension furthered quality health care. Article II, Part A, Section 2 of the hospital's Credentialling Policy states:

Only physicians and dentists who:

. . .

(d) can document their:

. . .

(4) ability to work harmoniously with others sufficiently to convince the hospital that all patients treated by them in the hospital will receive quality care and that

the hospital and its medical staff will be able to operate in an orderly manner

shall be qualified for appointment to the medical staff.

Dr. Fishter, a staff psychiatrist at Lewistown Hospital, whom the Credentials Committee asked to serve as a consultant, and who acts as a professional consultant to various agencies, reviewed some 144 documents on Dr. Gordon. (*See* Notes of Testimony, N.T., Testimony of Michael S. Fishter, M.D., Fair Hearing of February 16, 1993). Dr. Fishter testified that, although Dr. Gordon is not an "impaired" physician according to the American Medical Association definition, he is a "disruptive" one. (N.T., Dr. Fishter's Testimony, 2/16/93, p. 97). In this regard, Dr. Fishter testified as follows.

Q. Did you reach any conclusion as to whether Dr. Gordon was a disruptive physician?

A. I reached a conclusion that the documents spoke to the fact, in my opinion, that Dr. Gordon matched the description of a disruptive physician.

Q. What is your description of a disruptive physician?

A. Well, essentially, I included in the report both Webster's dictionary definition and the Duquesne Law Review's disruptive physician definitions, because I wanted no misinterpretation between members of the Credentials Committee and myself concerning the language.

So, essentially, disruptive is to interrupt the ordinary course of things, the normal course of things, is disruptive. And, as defined in the Duquesne Law Review, the disruptive practitioner is by definition contentious, threatening, unreachable, insulting and frequently litigious.

He will not, or cannot, play by the rules, nor is he able to relate to or work well with others, unquote.

(N.T., Dr. Fishter's Testimony, 2/16/93, pp. 97–98).

Dr. Fishter further testified:

Although Dr. Gordon himself has, to my knowledge and in no documentation, ever demonstrated anything but competency as a practitioner in his specialty, there is rep-

etitious reference to the supporting staff being intimidated, being distracted, fearful, which, if your supporting staff is not able to attend clearly only to the business at hand, namely, the management of the patient, in my opinion, that is placing patient care at risk.

(N.T., Dr. Fishter's Testimony, 2/16/93, p. 100).

■ Because disruptive behavior by a physician at work relates to his or her professional conduct, we reject any notion that the Board did not take its professional review action in the reasonable belief that it was furthering quality health care merely because Dr. Gordon's suspension was not based on incompetence. Further, that Dr. Gordon testified that certain ophthalmologic services were unavailable to the community due to his suspension does not mean that the Board failed to meet the first element of section 11112(a) in conducting its professional review action. As the hospital notes, Dr. Gordon testified in a later deposition that the bulk of the patients scheduled for eye surgery had their surgery postponed, and the two patients who could not have their surgery postponed were referred elsewhere. (N.T., Deposition Testimony of Alan Gordon, M.D., dated August 16, 1996, pp. 165–166). As well, the fact that the hearing examiner reduced Dr. Gordon's suspension initially imposed by the Credentials Committee does not mean that the Board's professional review action was not taken in accordance with the first prong of section 11112(a), especially where the hearing examiner also concluded that Dr. Gordon is a disruptive physician.

What is more, contrary to Dr. Gordon's assertions, the immunity presumption is not rebutted by the fact that he submitted an affidavit to the trial court of his expert witness, Cyril H. Wecht, M.D., to the effect that the hospital could not have reasonably believed Dr. Gordon's suspension furthered quality health care. We note that the hospital also submitted an expert witness affidavit in this regard, that of Hugh Payne Greeley, chairman of The Greeley Company, a private hospital/medical staff consulting firm, who stated in part:

16. Dr. Gordon questions whether Lewistown Hospital acted in the reasonable belief that its actions were in the furtherance of quality health care. The materials that I have reviewed consistently demonstrate that the Hospital's concern for the quality of patient care and for the harmonious operation of its activities (activities primarily devoted to the provision of quality patient care) were the primary motivators for its continuing concern regarding Dr. Gordon's behavior. Dr. Gordon did not engage in one isolated incident of behavior that might be considered disruptive or unprofessional. Rather, the documents provided to me indicate that Dr. Gordon was involved in numerous episodes of disruptive and unprofessional behavior. Where, as here, a physician's behavior is disruptive to the activities of the hospital, affects the quality of services provided and/or creates a condition in which employees must act in an environment of fear and trepidation, a hospital is *required* to take action.

(Affidavit of Hugh Payne Greeley, dated October 16, 1996, para. 16). (Emphasis in original).

With regard to whether the professional review action was taken after a reasonable effort to review the facts of the matter, we disagree with Dr. Gordon that the Board failed to make this effort. Dr. Gordon points out that, before recommending his suspension, the Credentials Committee met with neither him nor his patient, the subject of whose care led to the doctor's verbal skirmish with a nurse on July 14, 1992. Dr. Gordon also takes issue with the fact that he was not permitted to interview anyone on the Credentials Committee's witness list without notice to and prior approval from the hospital president, although the committee had met with these witnesses before recommending his 28–day suspension.

Nonetheless, the record reflects that, in reaching its decision to suspend Dr. Gordon's clinical privileges for four weeks, the Board reviewed the Appellate Review Panel's decision, which it adopted unanimously, and also reviewed the Hearing Officer's report and recommendation. The record also reflects

two days of hearings before the Hearing Officer, at which time, as the trial court noted, Dr. Gordon was able to present witnesses, including himself and the patient at issue, and cross-examine adverse witnesses, including Dr. Fishter. As *Mathews* explains at 87 F.3d 637, the pertinent question is "whether the totality of the process leading up to the Board's 'professional review action'" evinces a reasonable effort to obtain the facts. Certainly, here, Dr. Gordon has not rebutted the immunity presumption under the second prong of section 11112(a), where the record shows that the Board did not impose a suspension until the hospital undertook a review process, which, as a whole, was a diligent effort to learn and assess the facts.

As to whether adequate notice and hearing procedures were afforded to Dr. Gordon, he does not dispute that notice was sufficient. He does, however, contend that the hearing procedures were inadequate. Again, Dr. Gordon complains that neither he nor his patient met with the Credentials Committee and that he was not permitted to contact anyone on the committee's witness list without prior notice to and approval from the hospital president. He also takes issue with the fact that, at the hearings, the hospital adduced Dr. Fishter's testimony and report based on 144 documents, which were not introduced into evidence, that allegedly detailed his longtime pattern of disruptive behavior. Dr. Gordon further complains that, although he appealed to the Appellate Review Panel on the bases that the Credentials Committee was prejudiced; that he was denied access to salient witnesses; that the Hearing Officer erred in denying him access to the 144 documents relied on by Dr. Fishter, which he was not allowed to refute; and that the Hearing Officer again erred by relying on these documents to impose a 14–day rather than a 7–day suspension, the Appellate Review Panel "inexplicably" reinstated the Credentials Committee's recommendation of a 28–day suspension and the Board adopted the panel's decision.

Frankly, in our opinion, none of these contentions serve to rebut the presumption of immunity under the third prong of section

11112(a). Dr. Gordon has not specifically shown how his case was weakened by the fact that neither he nor his patient met with the Credentials Committee, and the hospital's policy does not require a personal interview with the committee before a recommendation of suspension. *See* Article III, Part C, Section 2 of the Credentialling Policy. Dr. Gordon has also failed specifically to establish how the fact that he had to obtain prior approval from the hospital president to interview certain persons on the committee's witness list weakened his case, and has not set forth in his brief here the name of any person to whom the hospital president denied him access outright. Moreover, although Dr. Gordon did not have access to the 144 documents upon which Dr. Fishter relied in testifying to Dr. Gordon's disruptive pattern of behavior, Dr. Gordon would have had personal knowledge of the events recorded in these documents and, at the hearing, during the course of Dr. Fishter's testimony, admitted to having seen some of the documents. (N.T., Dr. Fishter's Testimony, 2/16/93, p. 126).

Further, the Hearing Officer himself explained:

I don't think it is necessary to get into each one of the 144, that the validity of each incident is not in issue here, rather the number of the conglomerations of incidents that is the pertinent [sic] concerns.

Therefore, I am going to essentially not allow examination an [sic] each and every incident. However, I am taking into consideration what Dr. Gordon has mentioned that the testimony of Dr. Fishter is based on what is presented by others rather than on firsthand knowledge. That is something that can be argued after the case is over in terms of how much weight.

(N.T., 2/16/93, pp. 123–124). Therefore, that Dr. Gordon did not have access to each and every document relied on by Dr. Fishter is uncompelling, where the hearing officer did not base his report and recommendation on the veracity of each specific document.

Of course, that Dr. Gordon appealed to the Appellate Review Panel from the Hearing Officer's decision to suspend his clinical privileges for 14 days, and the Appellate Review Panel reinstated the Credentials Committee's decision to suspend him for 28 days, and that the Board then adopted the Appellate Review Panel's decision does not automatically render the hospital's hearing procedures unfair, unreasonable, in bad faith, or illegal. We especially note that the Hearing Officer in this case, in compliance with the procedural safeguards of Section 11112(b)(3)(A)(ii) of the Federal Act, was not "in direct economic competition" with Dr. Gordon, as the doctor asserts some members of the Credentials Committee were, and yet the Hearing Officer still determined that Dr. Gordon was indeed a disruptive physician.

With regard to the last element of the test for immunity from monetary damages, whether the action was taken in the reasonable belief that it was warranted by the ascertained facts after notice and hearing, Dr. Gordon again argues that the hearing procedures were inadequate and that the hospital did not make a reasonable effort to obtain the facts. However, we are satisfied that the Board reasonably believed that the suspension was warranted by the facts known. As the hospital notes in its brief to this Court, Dr. Gordon's brief to the Hearing Officer begins as follows. "I would first like to thank you for what I feel has been a fair hearing." As the hospital also notes in its brief here, Dr. Gordon testified at the April 5, 1993 hearing with respect to the July 14, 1992 incident (and others) as follows.

Q. I am asking you on cross-examination: Why did you yell at her?

A. I yelled at her because I was frustrated.

Q. Is that a professional way to act?

A. It is a professional way? It is a foolish way to act.

Q. Answer my question, please, if you can?

A. Professional way?

Q. As a physician, with many years experience who is board certified, who has a superior position to a nurse, is that a professional way for a physician to act to a nurse?

A. Perhaps not.

Q. Are you saying perhaps not?

A. No, it is not.

Q. Has it been your experience that you achieved the goal you wanted to achieve, which is getting the best things for your patient by yelling at people?

A. No. It has not been my experience.

Q. Have you done that before?

A. Have I done that before?

Q. Have you yelled at people before?

A. I yelled at the quality assurance person.

Q. And on other occasions?

A. Yes.

Q. That was in the context of trying to do right by your patient?

A. It happened a couple times over the past couple of years.

Q. Have you achieved your goal?

A. No, and I am learning, I am learning that.

(N.T., Dr. Gordon's Testimony, 4/5/93, pp. 268–269).

As previously explained, Dr. Gordon had received a warning letter from the Credentials Committee Chairman on February 13, 1992 that the next substantiated episode of disruptive behavior by him could result in his suspension. On this record, given his behavioral history at work, Dr. Gordon has failed to rebut by a preponderance of the evidence the presumption of hospital immunity for a professional review action under the fourth element of Section 11112(a) of the Federal Act.

Because we have determined that, pursuant to the Federal Act, the hospital is entitled to immunity from Dr. Gordon's state claims seeking damages, we affirm the common pleas court's grant of the hospital's motion for summary judgment on Count III (tortious interference with business relations) and Count V (defamation) of the amended complaint. Both of these counts specifically seek only a monetary remedy. Although they both contain a clause that "your Honorable Court provide and grant such other relief as may be deemed just and proper[,]" we hold that this catch-all term is insufficient to stand as a specific request for some non-monetary remedy.

However, in Count II (14th Amendment claim) of the amended complaint, Dr. Gordon specifically requests a non-monetary remedy (new hearing), and, in Amended Count VI of the amended complaint (breach of contract), he specifically requests a non-monetary remedy (specific performance) as well as damages. Therefore, despite the fact that the hospital is immune from Dr. Gordon's claim for damages for breach of contract, we still must proceed to determine whether summary judgment should have been entered on Count II and Amended Count VI of the amended complaint.

First, under Count II, Dr. Gordon asserts that the hospital denied him due process and equal protection of the laws. Dr. Gordon therefore seeks

a new hearing at which any and all evidence being considered in the procedure, contrary to or beneficial to [his] position, is fully disclosed to [him], so that [he] will have the opportunity to examine, and if need be, object to any evidence being offered by Defendant and/or to cross examine the person or persons who prepared any and all documents being submitted for judicial consideration.

Dr. Gordon contends that the hospital is a quasi-public institution and a state actor and, therefore, it should be found liable for violating his 14th Amendment rights in failing to afford him due process and in failing to treat him as it did its other physicians.

■ We will assume that the hospital was required to comply with the requirements of the 14th Amendment in conducting its peer review process, and we hold, as did the common pleas court, that the hospital adequately afforded Dr. Gordon both notice and an opportunity to be heard. In his brief here, Dr. Gordon asserts that he is entitled to a peer review that does not include decision-makers economically interested in his suspension; that allows him to meet with witnesses without interference by the hospital; and that permits him to address certain matters that determined his punishment. He also maintains that the hospital denied him his right to engage fully in his profession. Having reviewed the record, we firmly believe that the

peer review and appeals process afforded Dr. Gordon by the hospital provided him with due process of the law.

The hearing officer in this case, by Dr. Gordon's own account, was a neutral party. As previously stated, while he recommended a two-week rather than four-week suspension, the hearing officer still believed Dr. Gordon to be a disruptive physician. Moreover, Dr. Fishter, the Credentials Committee's consultant in this case, was a psychiatrist, obviously not in direct economic competition with Dr. Gordon, an ophthalmologist. The peer review conducted here was, as the common pleas court noted, a four-tiered process, and suspension of Dr. Gordon was recommended and/or instituted at every stage. Although Dr. Gordon argues that some of his direct economic competitors were decision-makers here, including persons who worked for or were affiliated with the Geisinger Medical Group, which he contends had a history of hostility toward him, the evidence shows no ophthalmologists participated in this professional review action. (*See* affidavit of Hugh Payne Greeley, 10/16/96, pp. 17–19). Further, as we have already stated, Dr. Gordon has not explained how the fact that he had to consult with the hospital president before meeting with persons on the Credentials Committee's witness list injured his case. As well, Dr. Gordon had every opportunity to defend himself against allegations that he was a disruptive physician, despite Dr. Fishter's reliance on some hearsay documents for his opinion. While Dr. Fishter relied on these documents for his opinion that Dr. Gordon evinced a pattern of disruptive behavior, Dr. Gordon's suspension was actually triggered by the July 14, 1992 incident, and was preceded by a specific warning of suspension after a previous incident had occurred. Last, we reject any notion that the hospital unfairly deprived Dr. Gordon of his full right to practice medicine, where the totality of the process leading to the professional review action evinced a reasonable effort to obtain the facts and was, in effect, the process due him.

Further, we reject any allegation by Dr. Gordon that he did not receive equal protection of the laws where he fails specifically to allege in his amended complaint that any other similarly situated physicians were not treated similarly. Moreover, contrary to Dr. Gordon's assertions, we do not agree that the affidavit of his expert, Dr. Cyril Wecht, supports his allegations that his equal protection rights were violated. We also reject the argument that Dr. Gordon's patients' equal protection and due process rights were violated because they could not have the physician of their choice treat them at Lewistown Hospital, since his patients' rights in this regard are not Dr. Gordon's to assert. We therefore affirm the common pleas court's entry of summary judgment on the merits of Dr. Gordon's 14th Amendment claim.

Last, we consider the merits of Dr. Gordon's breach of contract claim. The non-monetary remedy he requests for breach of contract is

(a) that Defendant be commanded to specifically perform said contract and continue to allow Plaintiff to use the privileges afforded to him by Defendant, along with all the rights which accompany said privileges in accordance with the terms of the agreement[.]

Dr. Gordon alleges in this last count that the hospital's by-laws constitute the terms of a contract, binding on both him and the hospital. *Berberian v. Lancaster Osteopathic Hospital Association, Inc.*, 395 Pa. 257, 149 A.2d 456 (1959). Dr. Gordon avers in his amended complaint that the hospital failed to follow its by-laws and therefore breached its contract with him, by failing to follow the specific procedures set forth in those by-laws for investigating and suspending a staff appointee. Specifically, he avers that the hospital denied him the opportunity to meet with the investigating committee before it made its report and that the hospital's Executive Committee commented on the Credentials Committee's recommendation before a hearing was held and a final recommendation submitted. He avers further that the hospital violated its by-laws' requirement of confidentiality in such matters as these, and did

not permit him adequate time to prepare his defense before the hearing.

The hospital denies these allegations, denies that the peer review process was unfair, and specifically denies that it breached its by-laws, citing particular sections of its Credentialling Policy, which is apparently a subsection of the hospital by-laws. (*See* the hospital's brief in support of its motion for summary judgment, Section E.1., p. 43). The hospital avers that its Credentialling Policy does not require the appointment of an investigating committee, but allows one to be appointed *at the discretion* of the Credentials Committee. The hospital specifically denies this and all other material allegations of this count of Dr. Gordon's complaint, and, on this basis, denies that it breached any implied contract with Dr. Gordon created by the by-laws.

The common pleas court, on the hospital's motion for summary judgment, and on review of the hospital's exhibits to that motion, found that Dr. Gordon did not make a claim for breach of contract because the hospital complied with its Credentialling Policy. The court concluded that the policy rendered the appointment of an investigating committee discretionary, and that it was not a breach of that policy for the Appellate Review Panel to have recommended without explanation a longer suspension than did the Hearing Officer. Finally, assuming for the purpose of ruling on the summary judgment motion that Dr. Gordon's allegation of professional bias on the part of some Credentials Committee members was true, the common pleas court concluded that that committee's recommendation was only one step in a multi-step peer review process that was otherwise unbiased and independent. Thus, the court concluded that there was no breach of the hospital by-laws' fair hearing requirement.

As to those arguments he makes in this Court and therefore preserves for our review, Dr. Gordon does little more in his brief than reiterate the various allegations of violations by the hospital of its own policy and state that the court committed reversible error in granting summary judgment. However, we agree with the common pleas court that no material issue of fact remains because all of these allegations, if taken as true, *do not individually or cumulatively constitute* a breach of any implied contract. A review of the motion for summary judgment, its answer and the briefs and exhibits, establishes that the hospital was not required to appoint an investigating committee in these circumstances.

■ As well, the assumed professional bias on the part of some Credentials Committee members is not a sufficient basis on which to pronounce the entire four-tiered review process unfair and, thus, a breach of the by-laws' fair hearing requirement. We have already discussed Dr. Gordon's complaints about reliance on Dr. Fishter's report and about the Board's imposition of a suspension in excess of the Hearing Officer's recommendation. These assertions, stated in the context of Dr. Gordon's breach of contract complaint,—that is, that reliance on Dr. Fishter's report was "simply unfair" and that the Board's exceeding the recommended suspension was "unreasonable" and "unfounded"— are insufficient to establish a failure to comply substantially with the hospital by-laws. *See Miller v. Indiana Hospital,* 277 Pa. Superior Ct. 370, 419 A.2d 1191 (1980) (alleged error in commencement of revocation proceedings cured by subsequent formal request for revocation; vagueness of witness list and charges are *de minimis* deviations from hospital by-laws not constituting impermissible breach under *Berberian* in proceeding *to revoke* hospital privileges.)

The common pleas court order is affirmed.

### ORDER

AND NOW, this 24th day of July, 1998, the Order of the Court of Common Pleas of Mifflin County, No. 1207 of 1993, dated May 23, 1997, is hereby affirmed.