# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 04-1553

———————

| | |
|---|---|
| Sharon D. Lee, M.D., Kansas City<br>Family Health Care, Inc., | * <br> * <br> * |
| Appellants, | * <br> * |
| v. | *   Appeal from the United States<br> *   District Court for the |
| Trinity Lutheran Hospital,<br>Health Midwest, | *   Western District of Missouri.<br> * <br> * |
| Appellees. | * <br> * |

———————

Submitted: January 14, 2005
Filed: May 24, 2005

———————

Before MURPHY, McMILLIAN and BYE, Circuit Judges.

———————

McMILLIAN, Circuit Judge.

Dr. Sharon D. Lee appeals from a final judgment entered in the District Court for the Western District of Missouri[1] granting summary judgment in favor of Trinity Lutheran Hospital and its sole shareholder, Health Midwest (collectively the hospital), on her federal and state claims. For reversal, Dr. Lee argues that the district

———————

[1]The Honorable Howard F. Sachs, United States District Judge for the Western District of Missouri.

court erred in holding that the hospital was immune from her suit for money damages under the Health Care Quality Improvement Act of 1986, 42 U.S.C.§§ 11101-52 (HCQIA).[2]  We affirm.

**BACKGROUND**

On May 27, 1994, Dr. Lee, a family practice physician on the hospital's staff, prescribed two drugs to treat an HIV patient for pneumocystis carinii pneumonia (PCP).  A nurse was concerned about the combination of the two drugs and contacted Dr. James Wooten, the supervisor of the hospital's pharmacy services.  Dr. Wooten researched the matter, but could find no information regarding usage of the drugs in combination.  He contacted the manufacturers of the drugs for more information.  By letters dated June 1 and June 2 of 1994, the drug manufacturers wrote to Dr. Wooten; neither manufacturer could recommend using the drugs in combination.  In the meantime, Dr. Wooten talked to Dr. Lee, expressing his concern about the safety of using the two drugs in combination, noting that if she proceeded to use the drugs in combination she might expose the hospital to liability.  Dr. Lee responded that she would use the drugs in combination, even if it meant discharging the patient from the hospital. Pursuant to hospital protocol, Dr. Wooten contacted the hospital's Pharmacy and Therapeutic Committee.  Dr. Beth Henry, a member of the committee, agreed that using the two drugs in combination was inappropriate and advised peer review of the matter.

On June 1, 1994, the Peer Review on Medicine Committee (Peer Review Committee) met to discuss Dr. Lee's use of the drugs. Dr. Mollie O'Connor, chief of the hospital's infectious diseases department, presented the matter, noting that the patient's chart did not contain adequate documentation concerning the PCP diagnosis

---

[2]Trinity Hospital closed in 2001, thus mooting Dr. Lee's claim for reinstatement.

and that the two drugs were not compatible and had highly toxic effects on a patient's bone marrow. The Peer Review Committee voted unanimously to suspend use of the drugs and to have Dr. Joan Akers, chair of the hospital's family practice section, talk to Dr. Lee. On June 2, Dr. Akers and several others physicians talked to Dr. Lee. The Peer Review Committee met again on July 6, 1994, and recommended that a sub-committee talk to Dr. Lee and review her patient records prospectively. The subcommittee, composed of Drs. Akers, Daniels and Sly, met with Dr. Lee to discuss her interactions with physicians, practice patterns and appropriate use of medications. Dr. Akers met again with Dr. Lee to set up a protocol for pharmacy review. On October 5, 1994, the Peer Review Committee noted that the subcommittee had reported that Dr. Lee had a consistent problem with drug usage, including "unapproved uses of approved drugs or toxic combinations in HIV patients," and approved prospective review of her charts and pharmacy review for six months.

In December 1994, Dr. Kathy Chase, director of the pharmacy, expressed concern to Dr. Akers about Dr. Lee's care of another patient. Dr. Akers then asked an infectious disease specialist and an oncologist to review the patient's chart. Both doctors believed that Dr. Lee had not conducted an adequate work-up. On December 7, 1994, the Peer Review Committee met and Dr. Akers discussed the subcommittee's chart review, noting the review had indicated that Dr. Lee had used drugs without adequate indications, had made probable diagnoses without corroborating studies, and inadequately documented her thought processes. To avoid a conflict of interest, the Peer Review Committee recommended that an outside specialist review Dr. Lee's charts.

At a January 4, 1995, Peer Review Committee meeting, Dr. Lee read a letter expressing her concerns with the peer review process, including that she had not been invited to attend the meetings and that the committee had breached confidentiality. On March 1, 1995, the Peer Review Committee met to discuss the chart of another of Dr. Lee's patients and asked her to supply additional documentation pertaining to

a diagnosis. On April 5, 1995, the Peer Review Committee met to review the charts of two more of Dr. Lee's patients. As to one of the patients, the committee noted a possible premature death, rated the chart a 4, which meant the "clinical practice was unexpected and unacceptable," and sent Dr. Lee a letter of inquiry about the patient. As to the chart of the other patient, the committee noted that Dr. Lee had already been asked to supply documentation pertaining to diagnosis and completion of the patient's history and physical, but had not done so. On May 3 and June 7, 1995, the Peer Review Committee again discussed the charts, noting that Dr. Lee's responses to the letters of inquiry did not address the concerns in the letters.

Pursuant to the Peer Review Committee's recommendation, in June 1995, Dr. Akers asked Dr. Glen Hodges, a physician at the Veteran Administration Medical Center in Kansas City, Missouri, and chairman of the medical center's AIDS task force, to review the charts of five of Dr. Lee's patients. Dr. Hodges, who had eight years experience at the medical center reviewing charts for documentation and medical care purposes, concluded that in four of five of the cases Dr. Lee had not met the standard of care. Dr. Hodges found numerous documentation deficiencies and other problems in the cases. Dr. Hodges also questioned the standard of care in the fifth case. At a July 26, 1995, Peer Review Committee meeting, Dr. Akers presented Dr. Hodges's report. After the presentation, Dr. Lee joined the meeting and submitted a letter in which she rebutted Dr. Hodges's report. She also expressed her belief that she was the subject of a "witch hunt." Dr. Lee was excused from the meeting, and the committee voted nine to two to suspend her clinical privileges pending her completion of a personalized education program for physicians, which included a psychiatric evaluation. By letter dated July 26, 1995, Dr. Akers advised Dr. Lee of the committee's decision to suspend her privileges and that the action was being taken because of her sub-standard treatment of the four patients whose charts Dr. Hodges had reviewed and her sub-standard treatment of three other patients, noting that the sub-standard care had placed the patients in potential imminent danger.

At an August 2 meeting, the Peer Review Committee reviewed two more of Dr. Lee's charts, rating them a 4. On August 3, 1995, the Executive Committee of the Medical Staff (Executive Committee) met with Dr. Lee to discuss the decision of the Peer Review Committee to suspend her privileges. Dr. Lee stated that she had provided her patients with the highest standard of care, but admitted that record-keeping was a problem. She asked that an ad hoc committee be appointed to review the charts that resulted in her suspension. Dr. Lee was excused from the meeting and after discussion of her comments, the committee voted to uphold the suspension pending review by an ad hoc committee's evaluation of the seven cases cited in Dr. Akers's letter. However, the Executive Committee rejected the Peer Review Committee's requirement that Dr. Lee attend the physician education program.

By letter dated August 22, 1995, Dr. O'Connor wrote to Dr. Scott Thompson, who was chairman of the Ad Hoc Committee, regarding Dr. Hodges's report. Dr. O'Connor noted agreement with many of the report's concerns, including lack of documentation supporting drug usage, but also noted her disagreement with several specific items. By letter dated August 28, 1995, Dr. Thompson invited Dr. Lee to a September 14 meeting of the committee to discuss patient care issues, which were set forth on an enclosed document entitled "Clinical Issues." The document listed nine categories of issues, including inappropriate use of medications, failure to follow established protocols for drug use, treatment based on presumptive diagnosis, inadequate or poor documentation, failure to address abnormal patient care data, and failure to obtain appropriate consults. Under each category were sub-categories with specific citations to the care of seventeen of Dr. Lee's patients. Dr. Lee attended the September 14 meeting and discussed the clinical issues, but the specifics of each patient were not discussed. On September 27, the Ad Hoc Committee sent a report to the Executive Committee recommending that Dr. Lee's staff privileges be revoked, noting that she did not meet the hospital's standard of care. The report further noted that there was "no evidence of change in clinical practice from the first documented

problem from a case in June 1994 as to the two most recent cases admitted in July 1995, despite numerous interventions."

On October 3, 1995, the Executive Committee unanimously adopted the Ad Hoc Committee's recommendation. By letter dated October 4, 1995, Ronald Ommen, chief executive officer and president of the hospital, notified Dr. Lee of the Executive Committee's decision to revoke her privileges. Ommen stated that the decision was based on the previously identified clinical issues and enclosed the document setting forth the issues. Ommen advised Dr. Lee that pursuant to the hospital by-laws she was entitled to a hearing to review the decision.

Pursuant to Dr. Lee's request, a Fair Hearing Committee, comprised of five physicians who had no prior involvement with the peer review process, met on May 14 and June 28, 1996. Dr. Lee appeared and was represented by counsel, who presented the testimony of Dr. Joseph Brewer, an infectious disease specialist. Dr. Brewer, who reviewed the charts of the patients identified on the "Clinical Issues" document, opined that in most of the cases Dr. Lee had met the standard of care of an infectious disease doctor who treated HIV patients. However, Dr, Brewer noted he had concerns that Dr. Lee had abruptly discontinued use of steroids for one patient and apparently had failed to obtain a neurological consultation for another patient. On July 18, 1996, the Fair Hearing Committee voted to reinstate Dr. Lee's privileges conditioned on her attending the physician education program, receiving psychological counseling and submitting medical records for review. By letter dated July 22, 1996, the committee notified Dr. Lee of its decision, stating that the reasons for the decision were her difficulty in cooperating with the hospital staff, inadequate documentation of diagnosis, drug usage and patient care, underutilization of consultations, and failure to meet the hospital standard of care. The letter noted that if Dr. Lee refused to abide by the conditions, the committee would affirm the Executive Committee's recommendation to revoke her staff privileges. On August 6, the Executive Committee voted to unconditionally revoke Dr. Lee's privileges,

reasoning, among other things, that the suggested conditions would be difficult to enforce and that the hospital could be exposed to liability for granting privileges to Dr. Lee "when concerns of inappropriate care have been identified."

Pursuant to the hospital by-laws, Dr. Lee appealed the Executive Committee's decision, and on September 18, 1996, appeared with counsel, before an Appellate Review Committee. In response to an inquiry whether Dr. Lee would abide by the conditions recommended by the Hearing Committee, Dr. Lee and her counsel stated that two of the conditions concerned mental health, but asserted that there was no evidence that Dr. Lee suffered from a mental health issue. Dr. Lee also complained about several other of the conditions. The Appellate Review Committee unanimously recommended to the board of directors that it unconditionally revoke Dr. Lee's privileges. On September 23, 1996, the board accepted the recommendation and notified Dr. Lee of its decision by letter dated September 24, 1996.

On October 11, 1996, pursuant to HCQIA regulations, 45 C.F.R. § 60.9(a), the hospital submitted an adverse action report to the National Practitioner Data Bank, reporting that Dr. Lee's clinical privileges had been revoked based on her inappropriate use of medication, failure to follow accepted and established drug protocols, providing treatment based on presumed diagnoses, inadequate or poor documentation, failure to address abnormal patient care data, failure to obtain appropriate consults, failure to work up mental status changes, failure to assume care of hospitalized patients, and unprofessional behavior.

Dr. Lee and Greater Kansas City Family Health Care (GKC) filed suit in state court against the hospital, alleging defamation and other state-law claims. After the third amended complaint added a federal anti-trust claim, the hospital removed the action to federal district court. Pursuant to the hospital's motion, the district court dismissed GKC as a plaintiff. The district court also denied Dr. Lee's motion to substitute another corporate plaintiff. On January 29, 2004, the district court granted

the hospital's motion for summary judgment, holding that the hospital was immune from suit for money damages under HCQIA.

**DISCUSSION**

The district court did not err in granting the hospital's motion for summary judgment on the basis of HCQIA immunity. "Congress passed the [HCQIA] to improve the quality of medical care by encouraging physicians to identify and discipline physicians who are incompetent or who engage in unprofessional behavior." Sugarbaker v. SSM Health Care, 190 F.3d 905, 911 (8th Cir. 1999) (Sugarbaker) (internal quotations omitted). "Congress believed that effective peer review would be furthered by granting limited immunity from suits for money damages to participants in professional peer review actions." Id. (internal quotation omitted). The HCQIA defines "professional review action" as:

> an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges . . . of the physician.

42 U.S.C. § 11151(9).

In order to be immune from suits for money damages, a professional peer review action must be taken:

> (1) in the reasonable belief that the action was in furtherance of quality health care,
> (2) after a reasonable effort to obtain the facts of the matter,

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and
(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain the facts and after meeting the requirement of paragraph (3).

Id. § 11112(a).

In addition, "[a] professional review action shall be presumed to have met the preceding standards . . . unless the presumption is rebutted by a preponderance of the evidence." Id. "The statutory presumption included in section 11112(a) adds a rather unconventional twist to the burden of proof in our summary judgment standard of review, but the determination of whether a given factual dispute requires submission to the jury must be guided by the substantive evidentiary standards that apply to the case." Sugarbaker, 190 F.3d at 912 (internal quotation omitted). Thus, "we must ask, Might a reasonable jury, viewing the facts in the best light for [Dr. Lee], conclude that [s]he has shown, by a preponderance of the evidence, that [the hospital's] actions are outside the scope of 1112(a)?" Id. (internal quotation omitted).

On de novo review, we conclude that Dr. Lee did not satisfy her "burden of producing evidence that would allow a reasonable jury to conclude that [the hospital's] peer review disciplinary process failed to meet the standards of HCQIA." Id. (internal quotation omitted). In this case, in addition to being aided by the statutory presumption, the hospital presented ample evidence that it met the statutory criteria.

As to § 11112(a)(1) and (2), Dr. Lee argues that she rebutted the presumptions that the hospital acted in a "reasonable belief that the action was in furtherance of quality health care" and "after a reasonable effort to obtain the facts of the matter," because she presented evidence that the report of Dr. Hodges, the outside reviewer, was "flawed." Dr. Lee notes Dr. Brewer's testimony at the hearing that in most cases

she had met the standard of care of a specialist treating HIV patients and the deposition testimony of Dr. Mark Jacobson, an HIV-specialist, who disagreed with Dr. Hodges's conclusions. Dr. Lee also notes that Dr. O'Connor disagreed with some of the specifics in Dr. Hodges's report, as stated in Dr. O'Connor's memo to the Ad Hoc Committee. Dr. Lee's argument "miss[es] the mark." Sugarbaker, 190 F.3d at 913. Even if Dr. Lee could show that "the [peer review actions] reached an incorrect conclusion . . . [that] does not meet the burden of contradicting the existence of a reasonable belief that [the hospital] w[as] furthering health care quality." Id. at 916; see also Mathews v. Lancaster Gen. Hosp., 87 F.3d 624, 636 n.9 (3rd Cir. 1996) (conflicting medical opinions did not call in question whether the hospital's reliance on report outside reviewer was reasonable).

Dr. Lee's argument concerning Dr. Hodges's report, which was based on his review of the charts of five of Dr. Lee's patients, is also unavailing because in suspending and revoking her privileges the hospital did not rely solely on the report, as she suggests. Before the suspension, Dr. Wooten's concerns about her use of two drugs in combination were confirmed by the drugs' manufacturers; the Peer Review Committee had determined that Dr. Lee had problems with "unapproved uses of approved drugs or toxic combinations [of drugs] in HIV patients;" an oncologist and an infectious disease doctor believed that Dr. Lee had not conducted an adequate work-up for a patient; and the Peer Review Committee noted documentation and other problems in other patient charts. After the suspension, problems were noted in the charts of at least ten other patients, as set forth on the "Clinical Issues" document.

Contrary to Dr. Lee's argument,"it is clear that concerns for health care quality remained at the forefront throughout the peer review process." Sugarbaker, 190 F.3d at 913. "The fact that some of the specific concerns shifted or changed over time does not rebut the presumption" that the hospital acted in the reasonable belief that it was furthering quality health care. Id. Nor does the fact that the Executive Committee rejected the Hearing Committee's recommendation to conditionally

-10-

reinstate Dr. Lee rebut the presumption that the hospital's decision to unconditionally revoke her privileges was made in the reasonable belief that the decision was in furtherance of quality health care. See id. at 913-14; see also Brader v. Allegheny Gen. Hosp., 167 F.3d 832, 843 (3rd Cir. 1999) (Brader) (fact that "not every panel reached the identical conclusions about the necessity of suspending [physician's] privileges" did not "meet [his] burden of contradicting the existence of a reasonable belief" the hospital was "furthering health care quality"). Objectively, it was reasonable for the Executive Committee to conclude that Dr. Lee should not have been allowed to continue to care for patients after numerous instances of sub-standard care had been identified.

In order to satisfy her burden of proof as to § 1112(a)(1) and (2), Dr. Lee also asserts that Dr. O'Connor, who first presented concerns about Dr. Lee's prescribing drugs in an unapproved manner to the Peer Review Committee, started a "crusade" against Dr. Lee because she was an economic competitor. The assertion is insufficient to show that the hospital did not act in furtherance of quality health care or after a reasonable effort to obtain the facts. Dr. Lee offers no evidence in support of her assertion. In fact, the evidence is to the contrary. Dr. O'Connor wrote to the Ad Hoc Committee to point out that, although she agreed with much of Dr. Hodges's report, she disagreed with some of it. In any event, this court has stated that "[i]n the HCQIA immunity contest, . . . the subjective bias or bad faith motives of the peer reviewers is irrelevant." Sugarbaker, 190 F.3d at 914; see also Wayne v. Genesis Med. Ctr., 140 F.3d 1145, 1149 (8th Cir. 1998) (physician's claim that two members of peer review committee were in direct economic competition with her was insufficient to rebut presumption that "peer review process was fair under the circumstances"). Contrary to Dr. Lee's claim that the hospital "steam-rolled" the process to "rubber-stamp" a "foregone conclusion," Appellant's Br. at 53-54, ample evidence showed that the hospital made its decision after "a reasonable effort to obtain the facts." Before Dr. Lee's privileges were revoked, the Peer Review Committee and Ad Hoc Committee met numerous times, the Hearing Committee

-11-

heard testimony for two days, and the Appellate Review Committee received Dr. Lee's submissions, including letters in support, and heard argument.

We also reject Dr. Lee's argument that the hospital did not afford her "adequate notice and hearing procedures," as required by § 11112(a)(3). There is no question that before the hospital revoked her privileges, Dr. Lee had ample notice and an opportunity to be heard. Indeed, in response to the Appellate Review Committee's inquiry regarding procedural concerns, Dr. Lee's counsel stated: "With regard to the Hearing itself, we have no challenge." Although Dr. Lee's counsel complained about a lack of due process up to the hearing, her complaints are without merit. Dr. Lee had notice of the Peer Review Committee's concerns and opportunities to present her case. We also note that "'under the HCQIA's emergency provisions, summary suspensions, 'subject to subsequent notice and hearing or other adequate procedures,' do not result in the loss of immunity, 'where the failure to take such an action may result in an imminent danger to the health of any individual.'" Sugarbaker, 190 F.3d at 917 (quoting § 11112(c)(2)). Moreover, "[t]he [HCQIA] does not require imminent danger to exist before a summary restraint is imposed. It only requires that the danger may result if the restraint is not imposed." Id. (quoting Fobbs v. Holy Cross Health Sys. Corp., 29 F.3d 1439, 1443 (9th Cir. 1994)).

Because "analysis under § 11112(a)(4) closely tracks . . . analysis under § 11112(a)(1)," id. at 916, as to this section, Dr. Lee reiterates arguments we have already rejected. In addition, she invites this court to review excerpts of charts of thirteen of her patients, asserting if we did so we would conclude that she "provided quality medical care to critically ill and dying patients of whom she would not let go without extraordinary, heroic effort." Appellant's Br. at 55. We cannot do so. "[T]he role of federal courts on review of [peer review] actions is not to substitute our judgment for that of the hospital's governing board or to reweigh the evidence regarding the . . . termination of medical staff privileges." Bryan v. James E. Holmes Regional Med Ctr., 33 F.3d 1318, 1337 (11th Cir. 1994) (internal quotation omitted).

Indeed, "the intent of [the HCQIA] was not to disturb, but to reinforce, the preexisting reluctance of courts to substitute their judgment on the merits for that of health care professionals and of the governing bodies of hospitals in an area within their expertise." Id. (internal quotation omitted).

Nor can we be influenced by Dr. Lee's assertion that in treating end-stage HIV patients in 1994 and 1995 she employed cutting-edge treatments that later became the standard of care. Even if true, in determining whether the hospital acted in a reasonable belief that it was furthering quality health care, our focus is on whether "the reviewers, with the information available to them at the time of professional review action, would reasonably have concluded that their actions would restrict incompetent behavior or would protect patients." Brader, 167 F.3d at 840 (quoting H.R. Rep., No. 903, 99th Cong., 2d Sess. 10 (1986)) (emphasis added). In so doing, and after consideration of Dr. Lee's other arguments concerning the statutory criteria, we conclude that she failed to present sufficient evidence to show the hospital did not act "in the reasonable belief that [its actions] w[ere] warranted by the facts known after such reasonable effort to obtain the facts and after meeting the requirement of [§ 11112(a)](3)." 42 U.S.C. § 11112(a)(4).

Because we hold that the district court did not err in granting the hospital immunity under HCQIA on her claims seeking money damages, we do not address Dr. Lee's argument that the district court abused its discretion in denying her motion to amend her complaint to add a corporate plaintiff.

Accordingly, we affirm the judgment of the district court.

———————————————