

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-12-2005

# Gordon v. Lewistown Hospital

Precedential or Non-Precedential: Precedential

Docket No. 03-3370

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Gordon v. Lewistown Hospital" (2005). *2005 Decisions.* Paper 482.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/482

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 03-3370

———

ALAN D. GORDON, M.D.;
ALAN D. GORDON, M.D., P.C., a corporation;
MIFFLIN COUNTY COMMUNITY
SURGICAL CENTER, a corporation,

Appellants

v.

LEWISTOWN HOSPITAL

———

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 99-cv-01100)
District Judge: Honorable Sylvia H. Rambo

———

Argued September 14, 2004
Before: ALITO, AMBRO and FISHER, *Circuit Judges*.

(Filed September 12, 2005)

Steven B. Varick (Argued)
Henry S. Allen, Jr.
Holland & Knight
131 South Dearborn Street, 30th Floor
Chicago, IL  60603

George M. Sanders
Audrey L. Gaynor & Associates
120 South Riverside Plaza, Suite 2150
Chicago, IL  60606
    *Attorneys for Appellants*

Jonathan B. Sprague (Argued)
Post & Schnell
1600 John F. Kennedy Boulevard
Four Penn Center, 13th Floor
Philadelphia, PA  19103

Susan M. Lapenta
Horty, Springer & Mattern
4614 Fifth Avenue
Pittsburgh, PA  15213
    *Attorneys for Appellee*

Robert B. Hoffman
Wolf, Block, Schorr & Solis-Cohen
212 Locust Street, Suite 300
Harrisburg, PA  17101
    *Attorney for Amicus-Appellant*
    *Pennsylvania Medical Society*

David E. Loder (Argued)
Duane Morris
30 South 17th Street
United Plaza
Philadelphia, PA 19103-4196
    *Attorney for Amicus-Appellee*
    *The Hospital & Healthsystem*
    *Association of Pennsylvania*

———

OPINION OF THE COURT

———

FISHER, *Circuit Judge*.

This antitrust case arises from professional review actions undertaken by Lewistown Hospital (the "Hospital") to stem unprofessional conduct engaged in by Alan D. Gordon, M.D. ("Gordon") that impacted adversely upon patient welfare. Gordon and two corporations of which he is the sole shareholder, Alan D. Gordon, M.D., P.C., and Mifflin County Community Surgical Center, Inc. ("MCCSC") (which operates an outpatient surgical center in Lewistown, Pennsylvania), asserted against the Hospital multiple violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, seeking both money damages and injunctive relief. The District Court granted summary judgment in favor of the Hospital regarding the majority of Gordon's antitrust claims that require as one of their elements a concerted action or conspiracy, and found no genuine issue of material fact that would support an inference of concerted action or conspiracy. The District Court also determined that, pursuant to the Health Care Quality Improvement Act ("HCQIA"), 42

3

U.S.C. §§ 11101-11152, the Hospital was entitled to immunity from money damages regarding the professional review actions at issue.[1] Thereafter, the District Court conducted a non-jury trial and entered judgment in favor of the Hospital on the few remaining antitrust claims that sought injunctive relief. Gordon raises multiple issues in this appeal implicating both the summary judgment and post-trial rulings of the District Court. We will affirm the comprehensive rulings of the District Court[2] that resulted in judgment for the Hospital as to all claims.

## I. Facts

### A. The Hospital

The Hospital, a general medical and surgical facility, is the only hospital serving Mifflin and Juniata counties in Pennsylvania. It provides primary and secondary acute inpatient care in addition to

---

[1]The immunity provided by the HCQIA for persons engaging in the peer review process is limited to damages liability. 42 U.S.C. § 11111(a). Disciplined physicians may still maintain actions for injunctive or declaratory relief. *See Imperial v. Suburban Hosp. Ass'n*, 37 F.3d 1026, 1030-31 (4th Cir. 1994) (detailing HCQIA legislative history regarding scope of immunity provided to individuals engaging in the peer review process).

[2]The District Court performed extensive analysis of the parties' claims both at summary judgment and in its post-trial findings of fact and conclusions of law set forth respectively at *Gordon v. Lewistown Hospital*, No. CV-99-1100, 2001 WL 34373013 (M.D.Pa. May 21, 2001), and *Gordon v. Lewistown Hospital*, 272 F. Supp. 2d 393 (M.D.Pa. 2003). Consequently, this opinion sets forth only those facts necessary to inform our analysis.

providing outpatient surgery through its outpatient surgery center. The Hospital does not employ any physicians, but instead grants staff privileges to physicians who practice there. The physicians granted staff privileges comprise the Medical-Dental Staff of the Hospital. A physician must be a member of the Medical-Dental Staff to practice at the Hospital. The Hospital's Credentialing Policy, adopted in 1991 and revised in 1997, sets minimum professional requirements for physicians practicing at its site.

The Medical-Dental Staff engages in a peer review process through its Credentials Committee. The Credentials Committee makes recommendations to the Hospital Board of Trustees, guided by the Hospital's Credentialing Policy, regarding whether particular physicians meet the minimum professional requirements to practice at the Hospital both as to their admission to and renewal of Medical-Dental Staff membership. The Credentialing Policy states in part that "[a]ppointment to the medical staff is a privilege which should be extended only to professionally competent individuals continuing to meet the qualifications, standards and requirements set forth in this policy." It also specifies that to qualify for staff appointment, a physician must be able to work harmoniously with others sufficiently to convince the hospital that all patients treated by him will receive quality care and that the hospital and its medical staff will be able to operate in an orderly manner. The Policy further states that recommendations for reappointment shall in part be based upon the appointee's "behavior in the hospital, cooperation with medical staff and hospital personnel as it relates to patient care or the orderly operation of the hospital, and general attitude towards patients, the hospital and its personnel."

5

B.   Gordon, Nancollas, and Their Respective Cataract Procedures

Gordon is an ophthalmologist first appointed to the Hospital's Medical-Dental Staff in 1980. Gordon and Dr. Paul Nancollas ("Nancollas"), an employee of Geisinger Medical Group-Lewistown ("Geisinger"),[3] who also was a member of the Medical-Dental Staff, were the only two ophthalmologists practicing at the Hospital. During the relevant period, the two employed different techniques in cataract surgery. Gordon's comments to patients regarding those differences and Nancollas's skills are at the heart of Gordon's antitrust claims.

Gordon performed cataract surgery using the phacoemulsification ("Phaco") procedure. The Phaco procedure involved making only a small incision in the cornea (which prevented bleeding) and used only topical anesthesia. Because the Phaco procedure led to a rapid improvement in vision, patients undergoing this procedure generally recovered in two (2) weeks. Gordon alleged that his Phaco procedure had fewer risks, took less time and cost 50% less than the extracapsular extraction ("ECCE") surgical technique employed by Nancollas. The ECCE procedure involved a larger incision and use of sutures. In addition, the ECCE procedure required that an anesthetic be injected into the back of the eye where the physician cannot see the end of the needle, risking damage to the eye and nervous system. Given the pain caused by the ECCE procedure,

---

[3]Geisinger provides both physician services and a health insurance plan. The health insurance plan is a closed plan, meaning that reimbursement of charges that patients incur will only be made if a Geisinger physician treats the patient. Gordon is not a Geisinger physician and has been denied admission to Geisinger's medical panel despite his attempts to obtain such status.

Nancollas also used a "sleep dose" of general anesthesia. Recovery from this surgery could extend up to three (3) months.[4]

Between 1993 and 1995, Gordon and Nancollas both placed various newspaper ads regarding their respective surgical practices in the Lewistown Sentinel in addition to other publications circulated in Mifflin and Juniata counties. In 1993, an ad (placed by Geisinger on Nancollas's behalf) indicated that Nancollas performed "modern cataract extraction" although at the time he still used the ECCE procedure. In response to what he perceived as false advertising, Gordon placed an ad in the Lewistown Sentinel comparing himself to Nancollas and urged readers to call the Hospital for information comparing the complication rates of their respective surgical outcomes. Although the Hospital informed Gordon of its belief that the release of such information was unlawful, and requested that he not suggest the release of such information in future advertisements, no disciplinary action arose from the ad. However, Gordon's subsequent ad of September 15, 1995, compared the two procedures, was critical of the "Geisinger ophthamologist" and indicated that all of the anesthesiologists at the Hospital preferred Gordon's anesthetic technique to that performed by Geisinger. Both Geisinger and Nancollas complained to the Hospital regarding this ad. The complaint was forwarded by the Hospital to the Credentials Committee because Gordon's ad indicated preferences of Hospital anesthesiologists. The Hospital took no disciplinary action against Gordon for this second ad, taking the position that it involved parties external to the Hospital, but indicated to Gordon its concern regarding the adversarial and unprofessional tone of Gordon's ad.

---

[4]We note that Nancollas has since switched to the Phaco procedure favored by Gordon.

7

In 1995, however, Gordon contacted Nancollas's patients and made disparaging comments about Nancollas. In June 1997, Gordon again disparaged Nancollas's skills to a patient and sent a letter questioning Nancollas's skills to more than thirty people, including the entire Hospital Board. The crux of Gordon's claims here concern the Hospital's response to the 1995 and 1997 incidents culminating in the forty-five day suspension and subsequent revocation for a period of five years of Gordon's Medical-Dental Staff privileges, both of which are discussed in the following section.[5]

      C.       Gordon's Conduct and Its Impact Upon His Medical-Dental Staff Privileges

               1.      The Suspension of Gordon's Medical-Dental Staff Privileges

In 1995, the Hospital received complaints from elderly patients who related that Gordon had telephoned them and made disparaging comments about Nancollas, with whom they were then

---

[5]To provide context, the Hospital chronicled a long history of disciplinary action regarding Gordon's professional behavior, not his competence. The details regarding these actions are set forth in the District Court opinions. These prior incidents, beginning in 1985, pertained to Gordon's disruptive behavior in using loud and profane language in public areas of the Hospital, verbally attacking other physicians within the Intensive Care Unit, yelling at a nurse who had witnessed his disruptive behavior, and telephoning a patient at her home regarding her decision to treat with another ophthalmologist. In 1992, Gordon verbally attacked a nurse in the Hospital's emergency department and received a 28-day suspension. *See Gordon v. Lewistown Hospital*, 714 A.2d 539 (Pa. Cmwlth. Ct. 1998).

treating. Hospital counsel twice wrote to Gordon's counsel warning that any additional complaints of this nature would trigger an investigation of Gordon's conduct. Despite this, Gordon called additional patients complaining about their decision to use Nancollas. By November of 1995, Gordon's harassing telephone calls to patients were addressed by the Hospital Credentials Committee, which determined that Gordon should be suspended for forty-five days and that his reappointment application should be postponed until after he had served the suspension. Gordon requested a hearing and was represented by counsel. Prior to the hearing, the Hospital received additional complaints regarding Gordon's conduct. As a result, Gordon was summarily suspended on April 19, 1996, pending completion of the hearing and any resultant appeals regarding the forty-five day suspension.

At the conclusion of a three-day hearing, the forty-five day suspension was upheld. The Hearing Officer found that: (1) Gordon precipitated a confrontation involving Geisinger between himself and Dr. Quereshi (a Geisinger physician) on June 19, 1995, in the presence of a patient; (2) the confrontation and its effects were "unacceptable and disruptive"; and (3) Gordon's concerns about Geisinger and medical economics did not excuse such conduct. The Hearing Officer also found that Gordon had expressed himself to a nurse in an unacceptable manner when he stated that she "didn't give a damn about the patients," "is a trouble maker and always has been" and that "you are all assholes." The Hearing Officer concluded that whether Gordon's concerns were real or perceived, he addressed them inappropriately. At the hearing, there also was testimony regarding Gordon's telephone calls to Nancollas's cataract patients during the period of June 1994 to April 1995, some of which were made the night before the patients were to undergo cataract surgery. Although Gordon recognized that his calls could increase patient anxiety, he nonetheless placed the calls to warn the patients about Nancollas.

9

The Hearing Officer concluded that the calls showed extremely poor judgment and cruelty towards patients. Gordon never appealed the Hearing Officer's decision to the Hospital's Appeal Review Panel.

          2.       The Revocation of Gordon's Medical-Dental Staff Privileges

During this period, Gordon's application for reappointment to the Medical-Dental Staff for the period of February 1, 1995 to January 31, 1997, was pending before the Credentials Committee. In light of the events to date, the Credentials Committee considered denying the application. But instead, it gave Gordon the opportunity to provide assurances that he understood the inappropriateness of his past conduct and to vow to conduct himself in the future in accordance with standards defined by the Credentials Committee and with all Hospital and Medical-Dental Staff bylaws. Specifically, on August 2, 1996, Dr. Charles Everhart, Chairman of the Credentials Committee, forwarded a letter to Gordon stating in part:

> The Credentials Committee has a very long history of dealing with problems created by your behavior and of imposing conditions and discipline in an effort to make you understand that your behavior cannot continue. A vastly disproportionate share of the Credentials Committee's time and of the Hospital's resources have been devoted to problems created by you. This is notice to you that those extensive efforts on your behalf are over. You will not be recommended for reappointment unless the Credentials Committee receives from you, absolute, credible assurances that you understand that your behavior has been inappropriate and that, in the future, you will consistently conduct yourself strictly

10

in accordance with [the] standards outlined in this letter and with all hospital and medical staff bylaws and policies.

On August 14, 1996, Gordon agreed to adhere to those requirements in a letter to Everhart stating in part:

I will use the administrative channels to register complaints or concerns about poorly functioning equipment or about others practicing at the hospital or assisting me.

* * *

I find that my phone calls to patients were counterproductive and I stopped making these calls in late 1995. Although I feel that patients ought to be informed of their situation, I have not called patients for sometime nor is it my intention to call or otherwise attempt to communicate with the patients of any other ophthalmologist for the purpose of commenting on that physician's training, skill or competency or the procedure performed by such physician.

By September 5, 1996, however, Gordon engaged in a shouting match in the presence of patients and nursing personnel with a physician who had referred a patient to Nancollas. Consequently, the Credentials Committee provided Gordon one last opportunity to explain his conduct as part of an investigation.

a. The Conditions of Gordon's Reappointment

On September 30, 1996, the Credentials Committee offered Gordon conditional reappointment if he agreed to seventeen "Conditions of Reappointment" ("Conditions"), the relevant portions of which follow:

(2) You must use appropriate administrative channels to register any complaint or concern that you might have about others practicing at the Hospital. Specifically, any complaint or concern about any other member of the Medical-Dental Staff must be in writing addressed to either the President of the Medical Staff or the Chairperson of the Hospital, with a copy to the President of the Hospital. Any complaint or concern about any nursing personnel shall be reported in writing to that individual's supervisor, with a copy to the President of the Hospital. Any other complaint or concern about scheduling, equipment or any other matter must be in writing directed to the President of the Hospital; and

(3) You shall not call, or otherwise attempt to communicate with, the patients of any other ophthalmologist, or other physician practicing in the Hospital, for the purpose of commenting on the physician's training, skill or competence or the procedure performed by such physician. Furthermore, other than in response to a specific question or for the

12

> purpose of a referral, you shall not make any comment about any other ophthalmologist as part of your discharge instructions or at any time when dealing with patients who have been or will be treated at the Hospital.

After consulting with counsel, Gordon indicated on October 10, 1996, that he would accept the Conditions. On November 11, 1996, the Chairman of the Hospital Board of Trustees, Robert Postal, notified Gordon of his reappointment to the Medical-Dental Staff subject to his strict adherence to the Conditions. On November 14, 1996, Gordon provided his written agreement to be bound by the Conditions. He now contends that these Conditions constitute an unreasonable restraint on trade. But as discussed *infra*, we find that they were reasonable in light of Gordon's conduct and do not impermissibly restrain trade in any relevant antitrust market.[6]

> b. Gordon's Breach of the Conditions of Reappointment

By June of 1997, Gordon had twice breached the Conditions causing a second revocation of his privileges. First, on a Sunday afternoon, he called the home of Mrs. Seecora, a then eighty-two year old former patient. Mrs. Seecora, who had since enrolled in the Geisinger Health Insurance Plan, was at that time a patient of

---

[6]We note, as the District Court found, that even once the Conditions were imposed, Gordon placed at least two ads in the Lewistown Sentinel with one of the ads pointing out the increased risks associated with the technique employed by the "Geisinger physician." The Hospital took no disciplinary action regarding these activities.

Nancollas.[7]  During that call, even after Mrs. Seecora stated that she was treating with Nancollas (which should have triggered Condition 3), Gordon proceeded to discuss with her the differences in procedures performed by each physician (despite the fact that Nancollas had already removed one of her cataracts); conveyed his personal animus for Nancollas, indicating that Nancollas was "just learning"; listed the unnecessary risks that she faced in having Nancollas remove her cataract; and told her that she had been misled and uninformed because Nancollas "sometimes doesn't tell the whole story."  Mrs. Seecora's daughter reported the incident to the Hospital President's office conveying that Gordon's unprofessional conduct had intimidated and harassed her mother.

Gordon also breached the Conditions when he mailed a letter dated June 4, 1997, to over thirty people, including the entire Hospital Board, the Hospital Credentials Committee, and the Hospital's Administration, containing a five-paragraph critique of Nancollas's surgical method.  The letter itself indicated that it was "sent on the request of the administration who notified [him] that if [he] did have concerns [concerning potential risks to patients], [he] should put them in writing rather than just verbally discussing them with the administration."  But per the Conditions of his reappointment, Gordon should have directed the letter to the President of the Medical

---

[7]Gordon treated Mrs. Seecora three (3) times from July 22, 1994 to September 1994.  On October 18, 1995, his office contacted Mrs. Seecora as a "follow-up" to her last appointment of September 1994.  On January 4, 1996, Gordon's office sent a re-call card to her.  On August 26, 1996, his office telephoned her, at which time she indicated she was doing well and seeing her eye doctor.  When Gordon's office contacted her again in April 1997, however, she declined to make an appointment, indicating that she was taking care of her condition.

14

Staff or the Chairperson of the Credentials Committee with a copy to the President of the Hospital. Despite this procedural shortcoming, because Gordon had raised a concern regarding the quality of care at the Hospital, the Credentials Committee initiated a quality study of Nancollas's procedure.[8] That investigation ultimately concluded that Nancollas's procedure fell within the applicable standard of care.

### c. The Decision to Revoke Gordon's Medical-Dental Staff Privileges

In the wake of this conduct, Gordon met with the Credentials Committee at their request on July 17, 1997. The next day, the Credentials Committee Chair informed Gordon that the Committee determined that he violated the Conditions of his reappointment and that he would be excluded from the Hospital after July 23, 1997. Gordon pursued a hearing on the recommendation, which was held on August 22, 1997. At the hearing, Everhart testified regarding the Hospital's ongoing concern about Gordon's unprofessional conduct and its potential threat to patient care. In addition, both Mrs. Seecora and her daughter conveyed that Gordon's Sunday afternoon telephone call to the then eighty-two year old was unprofessional, inappropriate, intimidating, and harassing. On September 25, 1997, the Hearing Officer upheld the revocation of Gordon's appointment and clinical privileges, concluding in part that "the Hospital could not draft a

---

[8]Surprisingly, given the history of Gordon's conduct, this was the first written complaint Gordon made regarding Nancollas's competency. Gordon critiqued Nancollas's surgical method, including: (1) the type of anesthesia used; (2) the longer duration of the procedure; (3) the length of the incision; (4) stroke risks associated with the incision and manner of administering anesthesia; and (5) unnecessary risks associated with Nancollas's use of certain equipment.

15

condition . . . that would protect the Hospital and its patients from Gordon's poor judgment." Gordon appealed the decision, but the Appellate Review Panel, in its November 24, 1997 Recommendation and Report, affirmed in part because Gordon continued to harass, intimidate and upset elderly and vulnerable hospital patients. On November 25, 1997, the Board informed Gordon that it had adopted the recommendation to revoke his privileges.

D.     The Hospital's Alleged Predatory Tactics

Gordon also contends that the Chairman of the Credentials Committee, Everhart, conspired with the Hospital to revoke Gordon's Medical-Dental Staff privileges in order to placate Geisinger's concern regarding his anti-Nancollas ad campaign and to prevent him from opening MCCSC as an independent surgical center.

1.     Everhart's Surgical Center

In 1995, the only surgical facilities in Mifflin and Juniata counties were the Hospital and an outpatient center attached via a corridor to the Hospital that was owned by Everhart. Everhart had a written market allocation agreement with the Hospital, prohibiting each from providing services that the other provided. That center possessed a then-State mandated Certificate of Need ("CON") for the performance of endoscopic procedures.[9] Apparently, in 1995, Gordon requested and was denied permission to operate out of Everhart's facility because ophthalmologic surgery did not conform to the CON among other reasons. *See Gordon*, 272 F. Supp. 2d at

---

[9]Until 1996, Pennsylvania law required that prior to opening an outpatient surgical center, the Commonwealth must issue a CON indicating that an unfulfilled need existed for additional medical facilities services in the proposed facility's service area.

16

410. Gordon threatened to open his own facility, which Everhart reported to the Hospital. In fact, both the Hospital and Gordon pursued a CON to open an outpatient surgical facility. But Everhart never competed with Gordon either in the outpatient surgical services market or the physician services market. Gordon contends that it was only after this threat to competition that the Hospital dredged up written patient complaints regarding the calls made by Gordon to Nancollas's patients. He further contends that Everhart and the Hospital worked in tandem to prevent Gordon's competitive threat.

## 2.      Geisinger

Gordon further contends that the revocation of his Medical-Dental Staff Privileges for his having commented upon Nancollas's cataract procedures to patients was precipitated not by his conduct, but rather as a result of the Hospital's economic relationship with Geisinger. In support of this, Gordon points to the 1995 expiration of Geisinger's lease for two-thirds (2/3) of the space in the Hospital's medical office building; Geisinger physicians' use of Hospital facilities; and its insurance plan's reimbursements comprising 16.9% of the Hospital's revenue. Gordon asserts that this economic dependence, coupled with Geisinger's prior request that the Hospital deal with Gordon's advertising against Nancollas, supports his theory of an antitrust conspiracy with respect to the Hospital's eventual suspension and subsequent revocation of his Medical-Dental Staff privileges. *See Gordon*, 272 F. Supp. 2d at 409-411.

## 3.      Discouraging Other Physicians from Practicing at MCCSC

In order to open MCCSC, Gordon required at least one anesthesiologist on staff. All anesthesiologists on the Hospital's Medical-Dental Staff were contractually precluded from practicing at

17

any other facility. Consequently, Gordon sought the services of non-Hospital anesthesiologists to assist him at MCCSC. Gordon contends that the Hospital attempted to dissuade anesthesiologists who indicated their willingness to work for MCCSC from joining Gordon and MCCSC. Gordon also contends that the Hospital interfered in his relationship with an orthopedic surgeon who, although a member of the Hospital Medical-Dental Staff, intended to perform surgery at MCCSC. *See Gordon*, 272 F. Supp. 2d at 412-13.

## II. Procedural History

### A.      Gordon's Complaint

In his June 25, 1999 Complaint subsequently amended on February 2, 2000,[10] Gordon asserted eight claims under the Sherman Act, 15 U.S.C. §§ 1-2, against the Hospital. He alleged five claims invoking Section 1 of the Sherman Act. 15 U.S.C. § 1. In Count I, he alleged that the Conditions governing his reappointment to the Medical-Dental Staff in 1996 constituted a contract in restraint of trade given that the Conditions prevented him from competing to retain or obtain business by providing information to patients regarding their surgical decisions and by foreclosing him from supplying services in the relevant physician ophthalmic service markets ("Conditions as restraint of trade"). Count II asserted that the Hospital illegally tied its outpatient cataract facility services to the purchase of ophthalmic services from a Geisinger physician,

---

[10]We note that in addition to this action, Gordon mounted various challenges to the revocation of his privileges. Two court actions filed in Pennsylvania state courts were summarily dismissed and upheld on appeal. *Gordon v. Lewistown Hospital*, 729 A.2d 1284 (Pa. Cmwlth. Ct. 1999) and *Gordon v. Lewistown Hospital*, No. 01071 HGB 1998 (Pa. Super. Ct. March 16, 1999).

Nancollas ("illegal tying"). In Count IV, Gordon contended that the Hospital and Geisinger entered into a reciprocal arrangement whereby Geisinger leased space from the Hospital on condition that the Hospital procure substantially all of its physician specialty services (including ophthalmology) from Geisinger ("reciprocal dealing"). Count V asserted that the Hospital engaged in a group boycott to exclude Gordon from the outpatient cataract surgery market ("group boycott"). In Count VI, Gordon plead that the Hospital engaged in exclusive dealing ("exclusive dealing").

Gordon also asserted three (3) claims invoking Section 2 of the Sherman Act, 15 U.S.C. § 2. He alleged in Count III that the Hospital attempted to monopolize the market for outpatient cataract facility services in the Lewistown area since 1996 ("attempted monopolization of facility services") and in Counts VII and VIII that the Hospital conspired with Geisinger to monopolize, respectively, the outpatient facility services market and the physician inpatient, outpatient, and outpatient ophthalmic surgical services market ("conspiracy to monopolize markets").

B.     The Summary Judgment Motions

The Hospital sought summary judgment on Gordon's antitrust claims alleging concerted activity or conspiracy. The claims implicated by the Hospital's summary judgment motion included: Count I (Conditions as restraint of trade), Count IV (reciprocal dealing), Count V (group boycott), Count VI (exclusive dealing) and Counts VII and VIII (conspiracy to monopolize markets). The Hospital argued that there was no genuine issue of material fact supporting an inference of the alleged concerted action or conspiracy. Gordon countered that the record contained ample evidence that the Hospital conspired with Geisinger and/or Robert Postal, Chairman of the Hospital Board of Trustees, to restrain his ability to provide

19

patients with information regarding the respective surgical procedures employed by him as compared to Nancollas. The District Court granted summary judgment on May 21, 2001, in favor of the Hospital on these Counts, concluding that Gordon had not presented any evidence from which a reasonable jury could find the existence of a conspiracy between the Hospital and Geisinger and/or Postal.

At the same time, the Hospital also moved for summary judgment on its affirmative defense that it possessed immunity from money damages liability under the HCQIA for its actions in suspending and subsequently revoking Gordon's Medical-Dental Staff privileges. The Hospital contended that those actions were "professional review actions" within the meaning of 42 U.S.C. § 11151(9), and thus gave rise to immunity from money damages. Gordon cross-moved for summary judgment on the Hospital's HCQIA immunity defense, asserting that: (1) the solicitation exception to the definition of professional review action applied, *see* 42 U.S.C. § 11151(9)(B) (exempting from HCQIA immunity an action by a professional review body that is primarily based on the "physician's fees or the physician's advertising or engaging in other competitive acts intended to solicit or retain business"); (2) the revocation of Gordon's Medical-Dental Staff privileges did not relate to either his competence or professional conduct, *see* 42 U.S.C. § 11151(9); (3) the revocation of his Medical-Dental Staff privileges was not based on conduct that affects patient welfare, *see* 42 U.S.C. § 11151(9); and (4) that granting immunity would violate the purpose of the HCQIA by punishing a physician for criticizing incompetent competitors. He also argued alternatively that even if there was a professional review action, the requirements for obtaining HCQIA immunity set forth in 42 U.S.C. § 11112(a) were not met. The District Court determined that application of the solicitation exception turned on the subjective intent of the physician engaging in

the professional conduct at issue. As subjective intent was a disputed issue of fact, summary judgment was denied.

Gordon and MCCSC also moved for summary judgment as to Count I (Conditions as restraint of trade), asserting that analysis of the claim under the traditional rule of reason test was not necessary to find that the Conditions governing his reappointment to the Hospital Medical-Dental Staff violated the Sherman Act. Rather, he argued that the "quick look" approach applied. *See United States v. Brown Univ.*, 5 F.3d 658, 668-69 (3d Cir. 1993). Applying instead the traditional rule of reason analysis to the claim, the District Court determined that Gordon and MCCSC failed to satisfy their initial burden of demonstrating that the Conditions resulted in anti-competitive effects in the relevant product and geographic markets. *Id*. The District Court concluded that there existed a genuine issue of material fact as to the scope of the relevant geographic market. *Gordon*, 1999 WL 34373013 at *11-12. Based on this determination, the District Court also denied the Hospital's motion for summary judgment as to Count II (illegal tying) and Count III (attempted monopolization of facility services), given that they also required definition of the relevant geographic market. *Id*. at *24-25.

In sum, upon entry of the District Court's May 21, 2001 Order, the only claims remaining for trial were Counts II (illegal tying) and III (attempted monopolization of facility services). But both parties filed motions for reconsideration of the May 21, 2001 Order resulting in the District Court's issuance of its August 15, 2001 order, modifying its prior ruling as to Count I (Conditions as restraint of trade) and HCQIA immunity. The District Court reinstated Count I, concluding that it had erred by including that Count as a claim that could not be maintained in the absence of conspiracy, particularly since it alleged a "contract" violating the Sherman Act. The District Court also reconsidered its prior ruling on HCQIA immunity, concluding that it had misinterpreted the solicitation exception by focusing on the physician's subjective competitive intent when it should have focused on the basis for the Hospital's action. Consequently, the District Court granted the Hospital HCQIA

21

immunity from damages regarding the 1996 suspension and 1997 revocation.

### C. The Bench Trial

Between April 3 and 23, 2002, the District Court conducted a non-jury trial as to the antitrust claims that survived summary judgment. These included Counts I (Conditions as restraint of trade), II (illegal tying) and III (attempted monopolization of facility services), pursuant to which Gordon sought injunctive relief in the form of rescission of the Conditions and reinstatement of his Medical-Dental Staff privileges. On July 11, 2003, the District Court entered judgment for the Hospital as to all remaining claims after issuing extensive findings of fact and conclusions of law.

### D. Issues on Appeal

On appeal, Gordon challenges the District Court's grant of summary judgment in favor of the Hospital as to: (1) HCQIA immunity from money damages for the 1997 revocation[11] of Gordon's Medical-Dental Staff privileges and (2) those of Gordon's antitrust claims which require a concerted action or conspiracy (i.e., Count IV (reciprocal dealing), Count V (group boycott), Count VI (exclusive dealing) and Counts VII and VIII (conspiracy to monopolize markets)). He also challenges the July 11, 2003 entry of judgment for the Hospital based upon the District Court's post-trial findings of fact

---

[11]Gordon does not challenge the application of HCQIA immunity to any damages arising from the 1996 suspension.

and conclusions of law with respect to Count I (Conditions as restraint of trade), Count II (illegal tying), and Count III (attempted monopolization).[12]

For the reasons that follow, we will affirm the District Court.

### III. Standards of Review

We have jurisdiction under 28 U.S.C. § 1291 to review the District Court's final order. We address Gordon's challenges consistent with their procedural development. We first will address the issues raised on appeal concerning the District Court's summary judgment rulings. *Gordon*, 2001 WL 34373013. Our review of the District Court's grant of summary judgment is plenary. *Mathews v. Lancaster General Hosp.*, 87 F.3d 624, 632 (3d Cir. 1996).

Next, we will consider the challenges to the District Court's findings following the non-jury trial. *Gordon*, 272 F. Supp. 2d 393. We review the District Court's factual findings from the non-jury trial under a clearly erroneous standard, meaning that a finding is clearly erroneous if we are left with a definite and firm conviction that a mistake has been committed. *United States v. Igbonwa*, 120 F.3d 437, 440 (3d Cir. 1997), *cert. denied*, 522 U.S. 1119 (1998). Finally, where we are confronted with mixed questions of fact and law, we apply the clearly erroneous standard except that the District Court's choice and interpretation of legal precepts remain subject to plenary review. *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 641-42 (3d Cir. 1991).

---

[12]In making its findings, the District Court determined that Gordon was not a credible witness regarding his conduct or the Hospital's reaction to it. The District Court also considered evidence that indicated Gordon's true motivation for this lawsuit – his desire to ruin the Hospital by dragging it through protracted and expensive litigation.

IV. Health Care Quality Improvement Act Immunity

In 1986 Congress enacted the Health Care Quality Improvement Act. As the name suggests, the purpose of the HCQIA was to improve the quality of medical care by restricting the ability of physicians who have been found to be incompetent from repeating malpractice by moving from state to state without discovery of such finding. 42 U.S.C. § 11101; H.R. Rep. No. 99-903 at 2, *reprinted in* 1986 U.S.C.C.A.N. 6384-6391. *See also Mathews*, 87 F.3d at 632 (recognizing the purpose of the HCQIA). The HCQIA established a national reporting system requiring that insurance companies report medical malpractice payments made; that boards of medical examiners report sanctions imposed against physicians; and that hospitals report adverse professional review information. 42 U.S.C. §§ 11131-33. To support that purpose and ensure that both hospitals and doctors engage in meaningful professional review, Congress provided immunity to those persons participating in professional review activities. See 42 U.S.C. § 11101(5), 11111(a); H.R. Rep. 99-903 at 2-3, *reprinted in* 1986 U.S.C.C.A.N. at 6385. Specifically, the Act provides that persons participating in professional review activities or providing information to professional review bodies are immune from suit for money damages arising out of their participation in such activities. 42 U.S.C. § 11111(a)(1)-(2). At its heart, the HCQIA was intended to deter antitrust suits by disciplined physicians. *Mathews*, 87 F.3d at 633.

Only actions that meet the definition of professional review action are eligible for immunity under the HCQIA. H.R. Rep. No. 99-903 at 21, *reprinted in* 1986 U.S.C.C.A.N. at 6403. The HCQIA defines "professional review action" as:

[A]n action or recommendation of a professional review body which is taken or made in the conduct of a professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely

the clinical privileges, or membership in a professional society, of the physician. Such term includes a formal decision of a professional review body not to take an action or make a recommendation described in the previous sentence and also includes professional review activities relating to a professional review action.

42 U.S.C. § 11151(9). In order to qualify for HCQIA immunity, a professional review action must be taken:

(1) in the reasonable belief that the action was in the furtherance of quality healthcare,

(2) after a reasonable effort to obtain the facts of the matter,

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

*Id*. at § 11112(a). A professional review action will be presumed to have met the preceding standards necessary for immunity to attach unless the presumption is rebutted by a preponderance of the evidence. *Id*. The HCQIA places a high burden on physicians to demonstrate that a professional review action should not be afforded immunity. 42 U.S.C. § 11112(a). In fact, an action is presumptively immune if it was made "in the reasonable belief that the action was in furtherance of quality health care." 42 U.S.C. § 11112(a). This test will be satisfied "if the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their action would restrict

25

incompetent behavior or would protect patients." H.R. Rep. No. 99-903 at 10, *reprinted in* 1986 U.S.C.C.A.N. at 6393; 42 U.S.C. § 11112(a).

As we previously recognized, this presumption of immunity creates an unusual standard for reviewing summary judgment orders, as the plaintiff bears the burden of proving that the professional review process was not reasonable and thus did not meet the standard for immunity. *Mathews*, 87 F.3d at 633. *See also Pamintuan v. Nanticoke Memorial Hosp.*, 192 F.3d 378, 388 (3d Cir. 1999). But Gordon attempts to avoid application of this presumption of immunity by attacking the actions taken against him on grounds that they were not "professional review actions" within the meaning of the HCQIA, 42 U.S.C. § 11151(9). It is Gordon's position that the professional conduct at issue did not affect adversely the health or welfare of patients as required by § 11151(9), and therefore there was no professional review action to confer immunity on the Hospital. He asserts that he only could be expelled from the medical staff as a result of a professional review action if it was based on either his competence or his professional conduct, which conduct affects or could affect adversely the health or welfare of a patient or patients. *See* 42 U.S.C. § 11151(9). Since his professional competence has never been in dispute, Gordon argues that he was expelled for his conduct in violating the Conditions – his telephone conversation with Mrs. Seecora and the June 4th letter. According to Gordon, in order to qualify its actions based on that conduct as a "professional review action" entitled to immunity under the HCQIA, the Hospital bore the burden to show that his conduct "could affect adversely the health or welfare of patients".[13]

_____

[13]We note that the arguments of The Pennsylvania Medical Society ("PMS") as amicus for Gordon promote our adoption of a heightened standard for providing HCQIA protection to a professional review action premised on physician conduct rather than competence. PMS suggests that the nexus between the physician conduct and adverse effect on patient welfare be judged by a standard of "concrete harm" or a realistic projection of it. However, as discussed *infra*, such a construction is not supported by the statute, as

26

The Conditions were imposed upon Gordon for the purpose of deterring Gordon's harassment and intimidation of elderly patients by calling them to disparage Nancollas's skills. The record contains a plethora of evidence that Gordon's conduct in violating the Conditions could affect adversely the health or welfare of patients. Perhaps most compelling is the testimony of Mrs. Seecora's daughter regarding the effect on her eighty-two year old mother of Gordon's derogatory comments about Nancollas. Additionally, Everhart testified that Gordon's behavior was unprofessional and posed a threat to patient care. The Hearing Officer concluded that perhaps no conditions could be drafted sufficient to protect the Hospital and its patients from Gordon's poor judgment. The Appellate Review Panel upheld the recommended credentialing action because the Seecora phone call demonstrated that Gordon continued to harass, intimidate and upset elderly and vulnerable hospital patients.

Such unprofessional conduct on the part of a physician is within the purview of a "professional review action" under the HCQIA. The plain language of the statute indicates the breadth of "conduct" encompassed within the definition of "professional review action" by the inclusion of conduct that "could affect adversely the health or welfare of a patient." 42 U.S.C. § 11151(9). The statute contemplates not only potential harm through use of the term "could," but it also affords protection to actions taken against physician conduct that either impacts or potentially impacts patient "welfare" adversely, meaning patient "well being in any respect; prosperity." Black's Law Dictionary (West Group, 7th Ed. 1999). Even if the statutory language was deemed to be ambiguous, the legislative history would support the same construction. *See* Health Care Quality Improvement Act of 1986, H.R. 5540, 99th Cong. 2d Session (1986), 132 Cong. Rec. at 30768 (Oct. 14, 1986) ("competence and professional conduct should be interpreted in a way that is sufficiently broad to protect legitimate actions based on matters that raise

---

it conflicts with the objective standard applicable for the presumption of immunity - - when an action is undertaken "in the reasonable belief that the action was in the furtherance of quality health care." 42 U.S.C. § 11112(a).

concerns for patients or patient care."). Other courts similarly have applied immunity in circumstances where a physician's unprofessional "conduct" was an issue in the challenged professional review actions. *See, e.g., Brader v. Allegheny Gen. Hosp.*, 167 F.3d 832, 835 (3d Cir. 1999) (affirming summary judgment in favor of Hospital afforded HCQIA immunity for peer review decisions involving a surgeon characterized as "a disruptive force in the hospital"); *Bryan v. James E. Holmes Reg'l Med. Ctr.*, 33 F.3d 1318, 1324 (11th Cir. 1994) (granting immunity when physician's privileges revoked for inappropriate and unprofessional behavior stemming from his "being a volcanic-tempered perfectionist, a difficult man with whom to work, and a person who regularly viewed it as his obligation to criticize staff members at [the Hospital] for perceived incompetence or inefficiency," some of which occurred in front of patients about to undergo surgery); *Morgan v. PeaceHealth, Inc.*, 14 P.3d 773 (Wash. Ct. App. 2000) (upholding immunity when physician's privileges suspended for sexual harassment and inappropriate behavior with patients); *Meyers v. Columbia/HCA Healthcare Corp.,* 341 F.3d 461 (6th Cir. 2003) (upholding immunity when physician's reappointment denied because of failure to timely disclose disciplinary actions in another state, personality problem and various incidents of disruptive behavior); *Imperial v. Suburban Hosp. Ass'n*, 37 F.3d 1026 (4th Cir. 1994) (affirming district court order granting summary judgment to hospital where physician's reappointment to staff denied on basis of hospital's conclusion that his professional activities did not meet standard of care, he was deficient in his record keeping, patient management, and work relationships with health care professionals at the hospital).

Gordon simply cannot escape the ramifications of his conduct by relying on a tortured construction of the statute that ignores the fact that, at all levels of the process, his conduct was found to adversely impact patient health or welfare. There is no question on this record that Gordon's conduct towards Mrs. Seecora adversely affected her welfare given that Gordon's comments caused her to question her decision to allow Nancollas to operate on her cataract in March of 1997. Nor will this Court substitute its judgment for that of health care professionals and the governing body of the Hospital as

28

to whether Gordon's conduct either did or could have an adverse impact on patient health or welfare. *See Brader*, 167 F.3d at 843 (citing *Bryan v. James E. Holmes Regional Medical Center*, 33 F.3d 1318, 1337 (11th Cir. 1994)); *see also Lee v. Trinity Lutheran Hosp.*, 408 F.3d 1064 (8th Cir. 2005). Accordingly, Gordon's arguments in this regard, though creative, must fail.

Gordon argues alternatively that his conduct with which the Hospital took issue falls within the ambit of the solicitation exception to professional review action. The HCQIA exempts from "professional review action" a number of actions not considered to be based on the competence or professional conduct of a physician. *Id.* One such exemption is the "solicitation exception," which excludes from HCQIA coverage actions "based on the competence or professional conduct of a physician if the action is primarily based on . . . the physician's fees or the physician's advertising or engaging in other competitive acts intended to solicit or retain business." *Id*. at 11151(9)(B).

In denying the motions for summary judgment as to HCQIA immunity, the District Court initially determined that the applicability of HCQIA immunity turned on whether Gordon's conduct (viewed from his subjective perspective) in contacting Mrs. Seecora and in mailing the June 4, 1997 letter was intended to solicit or retain business. But upon reconsideration, the District Court determined that the relevant intent is that of the Hospital in undertaking the action, not whether the physician had the subjective intent to solicit business when engaging in the conduct at issue. If the action were "primarily based on" conduct relating to the physician's fees or the physician's advertising or engaging in other competitive acts intended to solicit or retain business, then the action would be excluded from HCQIA coverage as a "professional review action." Ultimately, the lack of evidence that the action was "primarily based on" Gordon's efforts to solicit or retain business proved dispositive and the Hospital was granted immunity from money damages under the HCQIA.

We conclude the District Court's construction upon reconsideration to be correct.[14] "It is elementary that the meaning of the statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain . . . the sole function of the courts is to enforce it according to its terms." *Abdul-Akbar v. McKelvie*, 239 F.3d 307, 312 (3d Cir.), *cert. denied*, 533 U.S. 953 (2001). The plain language of the solicitation exception focuses on the basis of the "action" taken by the professional review body, not on the conduct of the physician precipitating the action – "*an action* is not considered to be based on the competence or professional conduct of a physician *if the action is primarily based* on . . . the physician's fees or the physician's advertising or engaging in other competitive acts intended to solicit or retain business." 42 U.S.C. § 11151(9)(B) (emphasis added). Our precedent applying an objective standard to determine immunity from money damages under 42 U.S.C. § 11112(a) further supports this construction. *See Mathews*, 87 F.3d at 635 (holding that § 11112(a) of the HCQIA imposes an objective standard which is met when peer reviewers reasonably conclude that their actions will restrict incompetent behavior or protect patients and recognizing that an objective standard furthers Congressional intent that immunity issues may be resolved at summary judgment); *Brader*, 167 F.3d at 840 ("Like other circuits, we have adopted an objective standard of reasonableness in

---

[14]Amicus for the Hospital, the Hospital & Healthsystem Association of Pennsylvania ("HAP"), aptly argue that the District Court initially erred in focusing on Gordon's subjective intent because "[w]hat the solicitation exception actually excludes is a review action based upon the mere fact that a physician has engaged in activities with the intent to solicit or retain business; it does not exclude actions taken on the basis of the review committees' reasonable conclusion that the physician's activities (whether or not intended to solicit business) are unprofessional." We agree with amicus's further assertion that if HCQIA immunity hinged on the disruptive physician's subjective intent, every disruptive physician would claim that the unprofessional conduct being reviewed was intended for a competitive purpose in order to invoke the solicitation exception to professional review action.

this context."). *See also* H.R. Rep. 99-903 at 10, *reprinted at* 1986 U.S.C.C.A.N. at 6392-93 (adopting objective standard that a professional review action must be undertaken in the reasonable belief that it is in furtherance of quality healthcare and rejecting a "good faith" standard as being capable of being misinterpreted as requiring only a test of the subjective state of mind of the physicians conducting the professional review action). Consequently, even when the solicitation exception is in play, immunity will be judged by applying the objective standard regarding whether the Hospital based its actions upon the reasonable belief that they are in furtherance of quality healthcare. *See* 42 U.S.C. § 11112(a).

The real issue in this regard is the sufficiency of the basis for the Hospital's actions, i.e., whether it was undertaken to protect patients. *See Brader*, 167 F.3d at 840. *See also Manion v. Evans*, Civ. No. 89-7436, 1991 WL 575715 at *8 (N.D. Ohio 1991), *appeal dismissed*, 986 F.2d 1036 (6th Cir.), *cert. denied*, 510 U.S. 818 (1993) (hospital granted HCQIA immunity at summary judgment where physician invoked solicitation exception to professional review action but evidence supported conclusion that actions were "motivated solely by [the Committee's] concern for the well being of patients," thereby placing the burden upon physician to produce evidence that the Committee was not engaged in a professional review action); *Rogers v. Columbia/HCA,* 971 F. Supp. 229 (W.D. La. 1997), *aff'd*, 140 F.3d 1038 (5th Cir. 1998) (primary reason for disciplinary action was professional competence despite competition between peer review committee and disciplined physician). This standard is an objective one that looks to the totality of the circumstances. *Mathews*, 87 F.3d at 635 (citing *Imperial*, 37 F.3d at 1030). Of course, as with any challenge to the applicability of immunity to a professional review action, the burden is on the physician to overcome the presumption that the hospital was engaged in a professional review action. 42 U.S.C. § 11112.

The record here establishes that the 1997 revocation of Gordon's Medical-Dental Staff privileges resulted from concern for patient welfare. Gordon's attempts to couch his telephone calls to Mrs. Seecora to fit within the parameters of the solicitation exception

are disingenuous based on the extensive record before this Court chronicling Gordon's continued inappropriate conduct undertaken to advance his personal agenda to the detriment of patient welfare. To hold otherwise on a record such as this would effectively chill effective peer review by permitting the subject of the peer review process to control the application of HCQIA immunity by couching his or her intentions to fit within the solicitation exception to "professional review action."

Based on the foregoing discussion, we will affirm the determination of the District Court to confer upon the Hospital HCQIA immunity from money damages.

## V. Antitrust Claims Requiring Concerted Activity

Gordon set forth multiple antitrust claims requiring proof of concerted activity or conspiracy. These claims invoked both Section 1 of the Sherman Act (*see* Counts I (Conditions as restraint of trade), IV (reciprocal dealing), V (group boycott) and VI (exclusive dealing)) and Section 2 of the Sherman Act (*see* Counts VII and VIII (conspiracy to monopolize markets)). The District Court granted summary judgment on grounds that there was no proof of concerted activity or conspiracy between the Hospital and Geisinger and/or Postal in undertaking disciplinary action against Gordon to restrain his ability to provide patients with competitive information.[15] Gordon challenges the District Court's grant of summary judgment in favor of the Hospital as to those claims. He also challenges the District Court's entry of judgment for the Hospital at the conclusion of the non-jury trial as to Count I (Conditions as restraint of trade). Because concerted action is required for all of the aforementioned claims, we

---

[15]The District Court initially granted summary judgment for the Hospital as to Count I (Conditions as restraint of trade). But upon reconsideration, the Court determined that it had erred by including this as a claim that required the existence of concerted activity or a conspiracy in order to survive summary judgment. Because there was a genuine issue of material fact regarding the relevant geographic market, that claim was part of the non-jury trial.

first address its parameters. We then address Gordon's challenge to the claims disposed of at summary judgment followed by our analysis of Gordon's challenge to the District Court's post-trial rulings regarding Count I (Conditions as restraint of trade).

A.     Concerted Activity

Section 1 of the Sherman Act provides:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

15 U.S.C. § 1. To establish a violation of Section 1, a plaintiff must prove: (1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action. *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1229 (3d Cir.), *cert denied sub nom. Moyer Packing Co. v. Petruzzi's IGA Supermarkets, Inc.*, 510 U.S. 994 (1993). *See also Big Apple BMW, Inc. v. BMW of North Am. Inc.*, 974 F.2d 1358, 1364 (3d Cir. 1992), *cert. denied*, 507 U.S. 912 (1993). Without proof of all of these elements, a Section 1 claim cannot be maintained. *Id.*[16]

The essence of a Section 1 claim is the existence of an agreement. *Mathews*, 87 F.3d at 639 (citing *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 999 (3d Cir. 1994), *cert denied*, 514 U.S. 1063 (1995). Unilateral action simply does not support liability; there must be a "unity of purpose or a common design and understanding or a meeting of the minds in an unlawful

---

[16]Claims for conspiracy to monopolize under Section 2 of the Sherman Act also require evidence of a conspiracy. 15 U.S.C. § 2. Section 2 of the Sherman Act prohibits monopolization, attempts to monopolize and conspiracies to monopolize any part of interstate trade or commerce.

arrangement." *Siegel*, 54 F.3d at 1131 (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984)). Concerted action is established where two or more distinct entities have agreed to take action against the plaintiff. *See Weiss v. York Hosp.*, 745 F.2d 786, 812 (3d Cir. 1984). Accordingly, it requires proof of a causal relationship between pressure from one conspirator and an anticompetitive decision of another conspirator. *See Big Apple BMW*, 974 F.2d at 1364.

### B. Claims Disposed of at Summary Judgment

Gordon challenges the grant of summary judgment in favor of the Hospital on those of Gordon's antitrust claims that require concerted action or conspiracy, concluding that there was no genuine issue of material fact regarding the concerted action. These include claims brought under Section 1 of the Sherman Act (Count IV (reciprocal dealing), Count V (group boycott), Count VI (exclusive dealing)) and claims brought under Section 2 of the Sherman Act (Counts VII and VIII (conspiracy to monopolize markets)). Gordon argues that the District Court erred given that the existence of concerted action is a fact-intensive inquiry not appropriate for summary judgment.

Our review of a grant of summary judgment is plenary. *Mathews*, 87 F.3d at 639. Summary judgment must be granted where no genuine issue of material fact exists for resolution at trial and the moving party is entitled to judgment as a matter of law. *Id*. citing Fed. R. Civ. P. 56(c). The moving party bears the burden of showing the absence of any genuine issues of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). A non-movant's burden in defending against summary judgment in an antitrust case is no different than in any other case. *In re Flat Glass Antitrust Litigation*, 385 F.3d 350, 357-58 (3d Cir. 2004); *Petruzzi's*, 998 F.2d at 1230 (citing *Big Apple BMW*, 974 F.2d at 1263).

When the question involves concerted action, the non-movant may rely solely on circumstantial evidence and the reasonable inferences drawn therefrom to withstand summary judgment. *Id*. But

this requires more than mere complaints of concerted action. There must be evidence that tends to exclude the possibility of independent action, meaning that the evidence reasonably tends to prove that the alleged conspirators had a conscious commitment to a common scheme designed to achieve an unlawful objective. *See Big Apple BMW*, 974 F.2d at 1364, citing *Monsanto Co. v. Spray-Rite Serv. Corp*, 465 U.S. 752, 764 (1984); *Alvord-Polk*, 37 F.3d at 1001. This is because mistaken inferences in this context may serve to chill the very conduct that the antitrust laws are designed to protect. *Alvord-Polk*, 37 F.3d at 1001 *(citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 594 (1986); *Monsanto*, 465 U.S. at 763-64). If such a showing is made, the movant bears the burden of proving that drawing an inference of unlawful behavior is unreasonable. *Id*. Evidence of conduct that is as consistent with permissible competition as with illegal conspiracy, without more, will not support an inference of conspiracy. *Alvord-Polk*, 37 F.3d at 1001. *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574 (1986).

Gordon takes exception to the District Court's conclusion that the Hospital's progressive discipline towards Gordon, which ultimately led to the 1996 suspension and 1997 revocation of his Medical-Dental Staff privileges, was unrelated to pressure from Geisinger. Gordon contends that there was ample evidence that Geisinger pressured the Hospital to muzzle his criticism of Nancollas, and that the Hospital did so without any independent permissible basis. He points to the Hospital's 1989 refusal to discipline him for the comments he made about Nancollas to a nursing home patient as compared to the actions undertaken in 1996-97 when the Hospital was concerned regarding Geisinger's renewal of its lease. According to Gordon, it follows that the Hospital strayed from its prior position of ignoring his conduct outside the Hospital and succumbed to pressure from Geisinger to muzzle Gordon by first suspending and then revoking his Medical-Dental Staff privileges.[17]

_____

[17]In addition to being the Chairman of the Hospital Board of Trustees, Postal also was the Chairman of the Mifflin County Industrial Development Authority, which was involved in advancing

35

We conclude, however, that the record evidence supports the District Court's conclusion. The whole of the evidence simply does not exclude the possibility that the Hospital acted independently in undertaking its professional review actions. *See Big Apple BMW*, 974 F.2d at 1365. No evidence of record exists to permit even an inference of a causal connection between Geisinger and the professional review actions resulting in the suspension and revocation of Gordon's privileges. *Id*. at 1364 ("A jury may not be permitted to speculate as to cause . . .; the plaintiff must demonstrate . . . 'a unity of purpose or a common design and understanding, or a meeting of the minds.'"). Gordon relies on the Hospital's "shift" in its response to Gordon's conduct, asserting that discipline only was undertaken in 1995 and 1996 given pressure from Geisinger, on which the Hospital was economically dependent. *Big Apple BMW*, 974 F.2d at 1365 (evidence of concerted action spanning several years existed including meetings among dealers indicating their opposition to new franchisees); *Arnold Pontiac-GMC, Inc. v. General Motors Corp.,* 786 F.2d 564 (3d Cir. 1986) (evidence of concerted action where after meeting with a competitor of plaintiff, dealer denied plaintiff's franchise application despite previous affirmative steps taken toward granting the franchise). But there is no evidence of Geisinger's involvement in the professional review action that resulted in the revocation of Gordon's Medical-Dental Staff privileges. A review of Gordon's tenure as a member of the Hospital's Medical-Dental Staff reveals a consistent pattern of disruptive and unprofessional conduct. The independence of the Hospital's actions in 1996 is not trumped simply because the Hospital's discipline of Gordon became increasingly severe over time. As we recognized in *Mathews*, "[s]imply making a peer review recommendation does not prove the existence of a conspiracy [among the hospital and its staff]; there must be something more such as a conscious commitment by medical

the financing for the Hospital Medical Arts Building in which Geisinger leased space. In light of this, Gordon attempts to link Postal's involvement in effecting Gordon's agreement to the Conditions (which he alleges "gagged" him from conveying information regarding Nancollas) to his interest in renewing the Geisinger lease.

36

staff to coerce the hospital into accepting its recommendation." *Mathews*, 87 F.3d at 639-640. Moreover, peer review actions, when properly conducted, generally enhance competition and improve the quality of medical care. *Id*. at 640 (citing *Weiss v. York Hosp*., 745 F.2d 786, 821 n.60 (3d Cir. 1984). Although theoretically the lease could support an inference that Geisinger's economic power may have had some influence on the Board's decision, Gordon has not produced any evidence of any communication between the Hospital and Geisinger regarding the revocation of Gordon's Medical-Dental privileges. Gordon also has not raised a genuine issue of material fact that Geisinger coerced the Hospital into revoking Gordon's Medical-Dental Staff privileges. There is as well no evidence to exclude the possibility that the Hospital acted independently in undertaking progressive peer review of Gordon. This precludes an inference of antitrust conspiracy. *Mathews*, 87 F.3d at 640-41.

Accordingly, we will affirm the grant of summary judgment to the Hospital as to Counts IV (reciprocal dealing), V (group boycott), VI (exclusive dealing), VII and VIII (conspiracy to monopolize markets).

### C. Post-trial Judgment Regarding Count I

Judgment was entered in favor of the Hospital following a non-jury trial as to Count I (Conditions as restraint of trade) in which Gordon alleged that the Hospital and the Chairman of the Hospital Board, Postal, imposed the Conditions to prevent Gordon from competing to retain or obtain business by communicating truthful non-deceptive information to patients relevant to their surgical decisions. He asserts that the Conditions constituted an unreasonable restraint of trade in that they foreclosed him from competing in the physician services market for outpatient cataract surgery, inpatient eye surgery and emergency eye surgery. It also is asserted that the Hospital sought to prevent MCCSC from competing with it in the facility services market for outpatient cataract surgery.

Gordon specifically contends that the District Court erred in concluding that he failed to sustain his burden of proving a *prima*

*facie* case under the traditional rule of reason test. First, Gordon challenges the District Court's application of the traditional rule of reason rather than the "quick look" rule of reason analysis. The latter applies in cases where *per se* condemnation is inappropriate but where no elaborate industry analysis is required to demonstrate the anticompetitive character of an inherently suspect restraint. *United States v. Brown Univ.*, 5 F.3d 658, 669 (3d Cir. 1993). Rather, the competitive harm is presumed and the defendant must set forth some competitive justification for the restraints. *Id.* Gordon contends that the information restraints were manifestly anticompetitive and not supported by any pro-competitive justification. Despite Gordon's protestations, the quick look approach may be applied only when an observer with even a rudimentary understanding of economics could conclude that the arrangement in question would have an anticompetitive effect on customers and markets. *California Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999). Such is not the case here, where even if the Conditions were a restraint, they represent a non-price vertical restraint between one hospital and one physician, which we have held is reviewed under the traditional rule of reason. *See Orson Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1368 (3d Cir. 1996) ("[v]ertical restraints of trade, which do not present an express and implied agreement to set resale prices, are evaluated under the rule of reason."). This is especially true given the District Court's determination, with which we agree, that Gordon and the Hospital were not competitors in the relevant market in November 1995 when he agreed to the Conditions. His competition in the facility services market did not commence until MCCSC opened more than one year later.

Application of the traditional "rule of reason" requires that a factfinder look at the totality of the circumstances in order to determine whether a business combination constitutes an unreasonable restraint of trade. *Brown Univ.*, 5 F.3d at 668. Under this test, Gordon bears the initial burden of showing that the alleged contract produced an adverse, anticompetitive effect within the relevant geographic market. *Id.* This can be achieved by demonstrating that the restraint is facially anticompetitive or that its enforcement reduced output, raised prices or reduced quality. *Id.*

Alternatively, because proof that the concerted action actually caused anticompetitive effects is often impossible to sustain, proof of the defendant's market power will suffice. *Id*.; *F.T.C. v. Indiana Federation of Dentists*, 476 U.S. 447, 460-61 (1986). Market power, the ability to raise prices above those that would otherwise prevail in a competitive market, is essentially a surrogate for detrimental effects. *Brown Univ.*, 5 F.3d at 668. We must be mindful that

> the legality of an agreement or regulation cannot be determined by so simple a test . . . as whether it restrains competition. Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question, the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be obtained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

*Board of Trade of the City of Chicago v. United States*, 246 U.S 231, 238-39 (1918). *See also Eichorn v. AT & T Corp.*, 248 F.3d 131, 144-45 (3d Cir.), *cert. denied*, 534 U.S 1014 (2001) (indicating totality of circumstances considered under rule of reason includes facts peculiar to particular business to determine the nature and purpose of the allegedly illegal restraint).

Although the District Court determined that Gordon met the concerted action requirement for purposes of this Sherman § 1 claim

39

through the existence of the Conditions of his reappointment, the District Court also determined that he failed to meet his burden of proving that enforcement of the Conditions by excluding him from the Medical-Dental Staff had anticompetitive effects. In applying the traditional rule of reason, we first must determine whether the Conditions had substantial anticompetitive effects. Gordon argues that the Conditions reduced output given that the output of a surgeon is not only the surgery itself but necessarily includes advice, scheduling, and hand-holding. *See National Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 99 (1984) (restrictions on output are unreasonable restraints of trade). Gordon claims that the Conditions impaired historically effective competition between surgeons competing to provide surgery services by prohibiting him from conveying comparative information regarding procedures that were essential for patients to make informed decisions. In advancing his argument, Gordon asserts that Condition 3 prevents him from communicating with Nancollas's patients or any other physician's patients for the purpose of conveying comparative information and that it prevents him from making "any comment" at any time about "any other ophthalmologist" with any person in the Hospital's service area. But Condition 3 only serves to chill Gordon's comments regarding other ophthalmologists as part of his discharge instructions or at any other time when dealing with patients who have been or will be treated by the Hospital, excepting comments made "in response to a specific question or for the purpose of a referral." In light of Gordon's history, precluding him from making gratuitous statements at any time and in whatever fashion he deemed appropriate regardless of its impact or potential impact on patient health or welfare does not, standing alone, elevate Condition 3 to having anticompetitive effects. Likewise, as the District Court determined, Condition 2 only prohibited Gordon from commenting upon a particular surgical method as it relates to a particular physician, and not, as Gordon contends, from differentiating himself and his methods in surgical meetings.

Next, we must determine whether the Hospital possessed market power in the relevant markets in order to determine if we may presume anticompetitive effects from the Conditions under the rule

40

of reason test. Determination of market power is a determination of fact; therefore we review the District Court's conclusions to determine if they are clearly erroneous. *Igbonwa*, 120 F.3d at 440. Gordon bore the burden of proving the relevant product and geographic markets affected by the Hospital's imposition of the Conditions. *Eichorn v. At & T Corp.*, 248 F.3d 131, 147 n.4 (3d Cir. 2001). Once the markets are defined, we must determine whether the Hospital's market share is sufficient to infer the existence of market power. *Fineman v. Armstrong World Industries, Inc.*, 980 F.2d 171, 201-02 (3d Cir. 1992). The relevant product markets (each containing a facility and physician services component) are: (1) general outpatient cataract surgery, (2) general inpatient cataract surgery; and (3) general emergency eye surgery. Gordon disputes the District Court's findings regarding the geographic market definition and determination of market power.

The relevant geographic market, from which the court calculates the market share in the relevant product markets, is that area in which a potential buyer may rationally look for the goods or services he seeks. *Pennsylvania Dental Ass'n v. Medical Service Ass'n of Pa.*, 745 F.2d 248 (3d Cir. 1984). The geographic scope of a relevant product market is a question of fact to be determined in the context of each case in acknowledgment of the commercial realities of the industry being considered. *Borough of Lansdale v. Philadelphia Elec. Co.*, 692 F.2d 307, 311 (3d Cir. 1982).

Gordon ascribes error to the District Court's determination that the relevant geographic market for general outpatient cataract surgery consisted of all hospitals and surgical centers performing outpatient cataract surgery within a 30 mile radius of Lewistown, rather than only Mifflin and Juniata counties as he had proposed.[18] He argues that defining a geographic market demands a review from the consumer's perspective and that the District Court's thirty mile

---

[18]The geographic market as defined by the District Court included Mifflin and Juniata Counties in addition to portions of Snyder, Union, Clinton, Centre, Huntington, Franklin, Cumberland and Perry Counties.

radius of Lewistown ignores the geography of the region – that Mifflin and Juniata Counties sit within a valley that was isolated by mountain ranges making the actual distances that patients must travel much greater than that perceived when relying on an "as the crow flies" radius. Gordon essentially seeks to substitute the Hospital's primary service area for the relevant geographic market. Absent more, however, a primary service area does not equate to the relevant geographic market for outpatient cataract surgery services. *See Miller v. Indiana Hosp.*, 814 F. Supp. 1254, 1263 (W.D. Pa. 1992), *aff'd*, 975 F.2d 1550 (3d Cir. 1992), *cert. denied*, 507 U.S. 952 (1993).

The District Court's findings regarding the scope of the geographic market were not clearly erroneous. The District Court determined from its review of Gordon's expert's report and testimony that the greater the importance of the medical procedure to patients, the greater the willingness of the patients to travel to receive that service. Further, the evidence revealed that two-thirds of the patients that live within eight miles of the Hospital received cataract surgery elsewhere. Conversely, approximately 21% of the Hospital's patients for outpatient cataract surgery live closer to other facilities yet chose Lewistown Hospital. Gordon's proposed two-county market excluded competitors for cataract surgery facilities services located in other counties to whom Lewistown area optometrists referred patients, including, among others, the J.D. Blair Hospital in Huntington, Centre Community Hospital in State College, Pinnacle Health System and Pennsylvania Eye Surgery Center in Harrisburg. Accordingly, the record supports the District Court's rejection of a two-county geographic market.

Gordon further challenges the District Court's determination that the Hospital lacked market power in the outpatient cataract surgery market even when using the District Court's thirty mile radius geographic market. He asserts that the District Court erroneously calculated percentages of market power based on two demonstrative exhibits prepared by the Hospital. The first chart ("Gordon/Nancollas Procedures Chart") reflected all patients in the twenty-eight zip codes that were within the thirty mile radius of Lewistown from which the Hospital drew patients. It summarized the number of procedures

42

performed by Gordon and Nancollas in 1996. Although the chart included some non-cataract procedures performed by those physicians, cataract procedures accounted for 95% of the total and reflected a Hospital market share of 46%. The second chart ("Ophthalmic Surgery Cases Chart") contained numbers for all ophthalmic surgeries performed on patients in the same twenty-eight zip codes but without identifying what percentage of those were cataract procedures. Using this chart, the District Court determined that the Hospital's market share was only 39%. Gordon contests this finding because the Ophthalmic Surgery Cases Chart reflects hundreds of specialized procedures that are not performed at the Hospital and necessarily are performed outside of the Hospital's service area. Instead, he advocates use of the Gordon/Nancollas Procedures Chart, which he claims more accurately described the cataract market. In either case, however, the market share is insufficient to prove market power. *Fineman*, 980 F.2d at 201 (50% share is insufficient as a matter of law to establish market power). In addition, the District Court analyzed a number of other scenarios, all falling well-below the legal threshold for market power. Perhaps most telling of the Hospital's lack of market power is the evidence that outpatient surgical volume at the Hospital declined significantly after Gordon left and that MCCSC became the dominant provider of outpatient cataract surgery within less than 2 years of the Hospital's decision to revoke Gordon's Medical-Dental Staff privileges. *See Assam Drug Co. v. Miller Brewing Co.*, 798 F.2d 311, 318 (8th Cir. 1986) (no market power because market share was declining). Despite Gordon's challenges, the District Court's finding that the Hospital lacked market power in the outpatient cataract surgery market was well supported by the evidence and therefore was not clearly erroneous.[19]

---

[19]Although Gordon also challenges the District Court's finding that the Hospital lacked market power in the inpatient eye surgery market, he failed to meet his burden of proof that the Hospital possessed market power in that market, particularly since Gordon's expert testified that the market for inpatient eye surgery services is *de minimis*. We affirm the District Court's finding in this regard. Gordon also argued that he met the prima facie requirements even

43

Based on the foregoing, we will affirm the judgment of the District Court regarding Count I (Conditions as restraint of trade).

## VI. Illegal Tying

In Count II, Gordon asserted that the Hospital illegally tied its outpatient cataract facility services to the purchase of emergency ophthalmologic services from a Geisinger physician, Nancollas, in violation of Section 1 of the Sherman Act. Tying is selling one good (the tying product) on the condition that the buyer also purchase another, separate good (the tied product). *See Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 475 (3d Cir.), *cert. denied*, 506 U.S. 868 (1992). The essential characteristic of a tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 11 (1984). Under the *per se* analysis, a plaintiff must prove that (1) the defendant sells two distinct products, (2) the seller possesses market share in the tying product market, and (3) a substantial amount of interstate commerce is affected. *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 512-13 (3d Cir. 1998). Applying the *per se* analysis, the District Court determined that Gordon failed to prove an essential element of his claim – that the tie impacted a substantial amount of interstate commerce. Because Gordon failed to present any evidence regarding either the patient volume effect or the dollar volume business that has been affected by the tied market of emergency eye surgery physician services, we conclude that the District Court's determination that the

---

when utilizing the traditional rule of reason and that the Hospital failed to sustain its burden of proving that there was a pro-competitive benefit from the Conditions. However, we need not reach this issue given our conclusion that the District Court's findings in this regard were not clearly erroneous.

Hospital's alleged tie did not affect a substantial amount of interstate commerce was not clearly erroneous.[20]

## VII. Attempted Monopolization

To prove attempted monopolization (Count III), Gordon must prove that the Hospital (1) had specific intent to monopolize the relevant market, (2) engaged in anticompetitive or exclusionary conduct, and (3) possessed sufficient market power to come dangerously close to success. *Barr Laboratories, Inc. v. Abbott Laboratories*, 978 F.2d 98, 111 (3d Cir. 1992). The District Court determined that Gordon's claim failed given that he could not show the Hospital's specific intent to monopolize the outpatient cataract surgery market or that the Hospital engaged in predatory conduct with a specific intent to monopolize. He challenges only the District Court's findings regarding the Hospital's attempt to impede MCCSC's competition in an attempt to maintain monopoly power in the outpatient ophthalmologic facility services market in violation of Section 2 of the Sherman Act.

Gordon contends that he offered direct evidence of both the Hospital's admissions of anti-competitive intent and of predatory acts violative of Section 2 of the Sherman Act. Specifically, he argues that the Hospital never suggested or proved any legitimate reason for its threats to an orthopedic surgeon who considered operating out of MCCSC; for the pressure exerted on an anesthesiologist not to work with Gordon at MCCSC; for its joint venture with Everhart's facility to counter Gordon's operations at MCCSC; or its market allocation

---

[20]Nor does Gordon's tying claim survive under a rule of reason analysis where he must prove that the revocation of his Medical-Dental Staff privileges unreasonably restrained competition in the market for emergency ophthalmologic physician services. Gordon cannot show that the Hospital's alleged tie of the emergency ophthalmologic surgery facilities to Nancollas's professional services unreasonably restrained competition, especially given that his own expert testified that the market for facility services was so small that he could not perform a geographic market analysis.

agreement with Everhart. But it was Gordon's burden to show more than the Hospital's intention to prevail over MCCSC or to protect its market position relative to MCCSC. *Pennsylvania Dental*, 745 F.2d at 260-61; *Morris Communications Corp. v. PGA Tour, Inc*., 235 F. Supp. 2d 1269, 1286 (M.D. Fla. 2002). Despite Gordon's arguments, predatory intent cannot be inferred from anticompetitive practices. The District Court properly rejected his evidence of "predatory" or "exclusionary" practices because the conduct complained of was not conduct without a legitimate business purpose. Unfairness alone is not enough to classify even disreputable business conduct as predatory. *Id.* at 260-61. Perhaps most significant is the District Court's determination that rather than acting with a specific intent to monopolize, the Hospital was acting with a specific intent to discipline "a persistently obstreperous physician who stubbornly refused to comply with the standards of courtesy and professionalism expected of a medical doctor."[21] The record supports the District

---

[21]Gordon complains that the District Court determinations hinged on "inadmissible hearsay evidence" of his disruptive and obstreperous behavior from the records of the Hospital hearings. Gordon had filed a motion *in limine* to define the scope of the issues at trial and to limit the case to consideration of Conditions 2 and 3 and their competitive effect. The District Court entered an order that

> Defendant may produce evidence regarding any disciplinary actions taken, the findings of the disciplinary bodies, and most important, Defendant's subsequent consideration of any previous disciplinary actions taken against Dr. Gordon. However, neither the Defendant nor Plaintiffs will be permitted to relitigate the alleged misconduct.

Gordon contends here that the District Court's reliance on the documents offered by the Hospital from the disciplinary proceedings (offered for the limited purpose of showing that the prior disciplinary actions occurred, its consideration of them, and notice to Gordon of prior discipline), was improper. He asserts that the District Court based its finding of his disruptive behavior solely upon those

Court's conclusion. Having found no clear error, we will affirm the District Court.

## VII. CONCLUSION

Based on the reasoning set forth in this opinion, we will affirm the judgment of the District Court as to all claims raised in this appeal.

---

disciplinary documents, which contained unrebutted and inadmissible hearsay. He further contends that because the order precluded relitigation of those issues, he did not rebut any of the evidence on which the District Court ultimately relied to find that he had a history of disruptive behavior.

The admissibility of evidence is within the discretion of the trial judge, and admissibility rulings will not be disturbed on appeal absent an abuse of discretion. *See Affiliated Manufacturers, Inc. v. Aluminum Co. of Am.*, 56 F.3d 521, 525-26 (3d Cir. 1995) (a district court's ruling as to admissibility of evidence is reviewed under an abuse of discretion standard, where the question involves the application of the Federal Rules of Evidence). When applying the traditional rule of reason to determine if the Conditions were reasonable, a court must review the totality of the circumstances. *Brown Univ.*, 5 F.3d at 668. Consequently, we find no abuse of discretion by the District Court for its consideration of documents from the disciplinary proceedings.